## ORONO PULP & PAPER CO. v. UNITED STATES, and three other cases.

District Court, D. Maine, N. D. April 22, 1929.

Nos. 132–134, 189.

Louis C. Stearns, of Bangor, Me., for appellant.

F. R. Dyer, U. S. Atty., and Wm. B. Nulty, Asst. U. S. Atty., both of Portland, Me.

PETERS, District Judge. These are suits brought to recover for alleged overpayments by the plaintiff of income and profits taxes assessed against it and paid for the years 1917 to 1920, inclusive, and involve somewhat different questions as to different years.

The decision of one point will settle practically the whole dispute concerning the taxes of 1917 and 1918, and that will be considered first.

The plaintiff is a manufacturer of pulp and paper in Maine, and owns timberlands as a source of raw material. Patton & Gulnac, at one time a partnership, and later a corporation, were lumbermen or woods operators, so called. In January, 1917, they had an option from the owners to purchase township 8, range 9, for the sum of $242,-000. Not being financially able to make the

purchase themselves, but desiring to reap some benefit from their option, and also to make a favorable contract in their line of business as operators, they opened negotiations with the plaintiff, which resulted in the purchase of the township by the plaintiff, and the acquisition of certain rights therein by Patton & Gulnac, the nature of which is to be determined from the contents of four documents, executed and delivered as a part of one transaction, together with such surrounding facts as throw light on the intention of the parties.

The documents are as follows:

(1) Agreement between plaintiff and Patton & Gulnac as follows:

"Memorandum of Agreement made and entered into this sixteenth day of January, 1917, by and between Henry Patton, of Albany, New York, and James Q. Gulnac of Bangor, Maine, parties of the first part, and the Orono Pulp & Paper Company, of Bangor, Maine, party of the second part.

"Witnesseth: Parties of the first part have an option from the Eastern Manufacturing Company to purchase of said Company Township 8, Range 9, W. E. L. S., Piscataquis County, State of Maine, exclusive of the Public Lot, for the sum of Two Hundred Forty-two Thousand Dollars ($242,000), reference to said option to be had, but parties of the first part have not the money to exercise said option and party of the second part agrees to furnish the money to exercise said option upon the terms and conditions herein contained.

"The title to said town is to be conveyed to the Orono Pulp & Paper Company and said Company is to keep an accurate account with said town, charging it with the original cost, and all sums paid out on account thereof which should properly be a charge against said town, including taxes and said town is to be credited with all sums received from said town from stumpage or otherwise. Interest is to be reckoned at five per cent. and yearly stops are to be made in said account, and the Orono Pulp & Paper Company agrees that when the town shall have paid for itself said Company will convey by quit-claim deed one-half of said town to said Patton & Gulnac.

"Said parties of the first part desire to operate for pulp wood and said party of the second part desires to obtain pulp wood for its mills, and the parties hereto agree to enter into a contract for thus cutting and obtaining pulp wood in the form hereto annexed, said contract continuing for five years, but at the expiration of five years contracts of like tenor so far as applicable shall be entered into for a term of three or five years as then to be agreed upon, except that the amounts to be paid to party of the second part and the amounts to be retained for stumpage to be then agreed upon, and so on for terms of three to five years until said town shall have paid for itself.

"If in any year parties of the first part shall not operate on said town, party of the second part shall have the right to operate on the town itself or to hire others to operate for pulp wood.

"This agreement shall bind the parties hereto and their respective heirs, executors, administrators and successors, and insure to their benefit wherever the context so requires or admits.

"Signed in duplicate the day and year first above written."

(2) Quitclaim deed from Eastern Manufacturing Company, the owner of the township, to Patton & Gulnac, to take up the option to purchase held by them.

(3) Quitclaim deed from Patton & Gulnac to Orono Pulp & Paper Company conveying the same township, and described as being the same conveyed by Eastern Manufacturing Company to them. Both these deeds are in the form commonly used in Maine to pass title to timberlands.

(4) The stumpage contract, the form of which was referred to in the agreement under 1 above as being annexed, and which is as follows:

"This Memorandum of Agreement made this sixteenth day of January, 1917, between Henry Patton of Albany, New York, and James Q. Gulnac of Bangor, Maine, parties of the first part, and the Orono Pulp & Paper Company, of Bangor, Maine, party of the second part,

"Witnesseth: Party of the second part owns T. 8, R. 9, W. E. L. S., in Piscataquis County, Maine, exclusive of the Public Lot. Parties of the first part agree to peel, cut and furnish to party of the second part not less than ten thousand cords nor more than fifteen thousand cords of peeled spruce pulpwood each year for five years from the date hereof from said township. The wood to be delivered the first year shall be peeled during the season of 1917, and shipped during the following winter, spring and summer, and so on each year for the five years.

"Party of the second part is to pay parties of the first part Nine Dollars and forty cents ($9.40) per cord, f. o. b. cars at any station on the Bangor & Aroostook Rail-

road, the freight rates from which station to the mills of the party of the second part of Basin Mills, in Orono, Maine, shall not be higher than the rate from Masardis on said Bangor & Aroostook Railroad to said mills.

"Simultaneously with the execution of this agreement another agreement is entered into between the parties hereto relative to said township, and out of said Nine Dollars and forty cents ($9.40) per cord Three Dollars ($3.00) is to be retained by party of the second part as stumpage and applied as provided in said other contract, so that for really doing the work of peeling, cutting, hauling, driving and loading the wood on the cars parties of the first part are to receive Six Dollars and forty cents ($6.40) per cord, stumpage paid.

\*　　\*　　\*　　\*　　\*　　\*

"It is hereby agreed and parties of the first part warrant that the title to said wood shall be perfect and absolute in said party of the second part (except stumpage, that being taken care of as provided above) immediately upon the completed delivery and acceptance of the whole or any part of such wood, to the extent of the wood so delivered and accepted, and same shall likewise be free and clear from all claims, demands, liens and encumbrances whatever, except the lien or claim of the said Orono Pulp & Paper Company for payment under this contract.

"The said Orono Pulp & Paper Company on its part hereby agrees to receive said wood as above, and pay to said parties of the first part the sum of Six Dollars and forty cents ($6.40) per cord for same, on cars, at said shipping point on the Bangor & Aroostook Railroad, in cash, on the 15th to 20th of each month, for the amount received during the previous months, according to the amount determined by measurements, as above named.

"In witness whereof the parties have hereunto interchangeably set their names this sixteenth day of January, A. D., 1917."

It is apparent from the above that the legal title to the township passed to the Orono Company, and that Patton & Gulnac held a five-year operating contract with that company as owner, and a separate contract which would entitle them to a conveyance from the company of one-half (undivided) of the township under certain eventualities.

This situation continued, and Patton & Gulnac operated on the town for the two ensuing logging seasons, and until it developed that the amount of advances made to them by the Orono Company was greatly in excess of the contract prices for the wood cut, and, their operations being unsatisfactory in other respects, the Orono Company, in April, 1920, paid Patton & Gulnac $25,000 in cash, and entered into a new contract with them, under which they canceled their stumpage contract and released their right to a conveyance of one-half of the township, and were released by the company from all claims for overpayments. All contractual relations between those parties then ceased.

In 1917 and 1918 the spruce bud worm, a rapacious defoliating insect, ravaged the forests of Maine, and on this particular township destroyed in the first year 26,445 cords of spruce growth worth $52,890, and in the second year 8,669 cords of spruce worth $17,338, and 112,000 feet of hemlock worth $448, a total in 1918 of $17,786. These losses are admitted to have occurred as stated, and these figures are stipulated to be correct. The amounts were claimed by plaintiff as deductions from gross income in the respective years, and were set up as such deductions in its second amended returns and in its claim for refund.

The claims of the plaintiff were disallowed by the commissioner on the ground that the title of the plaintiff was that of a mortgagee, and that no loss was determined in either 1917 or 1918 by a closed and completed transaction, nor shown to be a loss sustained by it at any time.

The court is asked by the defendant to find as a matter of law that the bud worm damage to the timber on the property in 1917 and 1918 represents a shrinkage in the value of the security held by the plaintiff as a mortgagee, and was not a deductible loss in those years. The defendant's position is that the $242,000, paid by the plaintiff for the township, was a loan to Patton & Gulnac. Thus the question as to whether the plaintiff was a mortgagee or the actual owner of the township becomes acute and decisive.

■ It is clear that on the face of the transaction no mortgage was given. The plaintiff held the absolute title by deed with no defeasance or conditional clause. If it is a mortgage at all, it is an equitable mortgage. "The criterion is the intention of the parties. In equity this intention may be ascertained from all pertinent facts either within or without the written parts of the transaction. Where the intention is clear that an absolute conveyance is taken as a security for a debt, it is in equity a mort-

gage. * * * The real intention governs. * * * The existence of a debt is well nigh an infallible evidence of the intention." Stinchfield v. Milliken, 71 Me. 567.

An equitable mortgage may be created by showing that a deed absolute in form was intended as security for an obligation or liability of some kind. "But an equitable mortgage can arise only from a specific agreement between the parties in interest, and there must be clear and unequivocal proof of the intention to create a mortgage and of the sum which it was to secure. A debt, obligation or liability to be secured is absolutely essential to every mortgage, no less to those which are recognized only in equity than to such as are enforceable at law. But it is not necessary in equity that the debt secured should be evidenced by notes, bonds or any other written obligation or promise to pay." 41 Corpus Juris, p. 294.

There is in this case no proof of any debt, obligation, or liability to be secured by the deed of land. There is no proof that the transaction was other than it appears to be on its face. If Patton & Gulnac were really borrowing $242,000 from the plaintiff, there was no apparent reason why the nature of the transaction should be concealed. An ordinary mortgage could have been given as readily as an absolute deed. If for any reason it was desired to avoid making a mortgage and note, there could easily have been drawn a separate defeasance stating the obligations and conditions resting on each party. It is evident that the plaintiff was seeking a supply of wood and not loaning money. There is nothing in the transaction which is any more consistent with a mortgage loan than with a purchase of land. No person testified that a mortgage was intended. Mr. Gulnac, called as a witness by the defendant, made no mention of entertaining any such view of the transaction, and he knew as much or more about the matter than any other person now living. It seems to be a gratuitous assumption on the part of the commissioner that Patton & Gulnac were under obligation to repay the $242,000. The theory that the deed to the Orono Company secured the payment of that sum of borrowed money, which was the full value of the township and probably more, is negatived by the provision in the contract that only one-half of the township was subject to the agreement to convey to Patton & Gulnac when the township should have paid for itself by the taking off of wood. This is not an uncommon transaction in handling timberlands. The holder of an option on a township, not being able himself to buy, sells the option to a party better circumstanced who wants timber. A commission or an increased price is asked, or, as in this case, a right to an interest in the land, after it is paid for in stumpage, is given the option holder as compensation or profit.

The evidence does not sustain the claim that the transaction was a mortgage. Neither can I concur with the claim that the loss was not determined in 1917 or 1918 by a closed and completed transaction. The parties have stipulated that the damage actually occurred in those years and have agreed upon the exact amount for each year. The plaintiff sustained the actual damage and loss in those particular years, or no one did. They are plainly deductible under the statute. See Whipple v. U. S. (D. C.) 25 F.(2d) 520, and cases cited.

Any question that might arise by differentiating the undivided half of the township under contract to Patton & Gulnac from the half not subject to any right of conveyance is disposed of by the fact that, applying the terms of the contract of conveyance to the amount of timber the parties have stipulated to be on the land at the time of purchase, it seems to be well established that the point never could be reached where Patton & Gulnac would be entitled to a conveyance. Figuring on taking off the maximum of 15,000 cords each year, ignoring the bud worm damage, counting interest and taxes as provided in the contract, the timber apparently would be exhausted before the purchase price of the township would be recovered in stumpage at the stipulated rate. The mathematical calculation in plaintiff's brief seems to establish this.

The claims of the plaintiff as to deductible losses by bud worm damage as an actual owner of the land in 1917 and 1918 are therefore sustained.

### 1919 Taxes.

The issue as to the 1919 taxes involves a consideration of the relations between the plaintiff and Patton & Gulnac who were operating on township 8, range 9, under the permit or contract above set forth, and also on another township under another contract.

Our entrance into the World War had the immediate effect of raising to abnormal figures the cost of labor and materials. Contracts with woods operators who were not strong financially at once became worth-

less, and owners generally recognized the situation and made new agreements with additional allowances to all operators.

Some time prior to July 1, 1918, Patton & Gulnac notified the plaintiff that they could no longer carry on under their contract, and the plaintiff made a new arrangement with them, and, to meet the emergency, undertook to make the necessary advances to take care of their pay roll and to pay all bills for supplies, placing its own clerk in the woods to do the business. In that way the operation could continue.

The contract price of $6.40 per cord for the pulp wood having become obsolete, it became necessary to make new figures. which the plaintiff would allow for the peeled wood delivered on the cars; and such figures were established on the basis of actual costs in another operation being carried on by another operator in the employ of the plaintiff; and, taking this other operation as a criterion, on the 1918–1919 cut there was first allowed $13 per cord for peeled wood and $6.40 for rough wood, and later, in 1920, after final figures were obtained on the other operation carried on by the plaintiff, $15 per cord for peeled and $6.50 for rough wood.

■ It should be noted here that this new agreement, made necessary by the mounting war prices, consisted of two parts: (1) To meet the emergency the Orono Company stepped into the breach and undertook to pay Patton & Gulnac's men and buy supplies to keep the operation going, there being no specified limit on the amount; and (2) revised figures were agreed upon to be allowed or credited Patton & Gulnac for wood when delivered. If the total amount ultimately advanced should be less than the total amount to be credited for wood at the new prices, there would be a balance due Patton & Gulnac. If the amount advanced turned out to be larger than that credit, then there would be a debt due the Company from Patton & Gulnac. As a matter of fact, the amount allowed and credited by the company to Patton & Gulnac, over and above the original contract price, was $96,-523, together with another sum of $19,799.-70 credited later to bring the total allowance up to the agreed figures. The amount charged by the plaintiff in addition to the above sums as due it for its total advances, after making some adjustments and including some interest, is $90,952.95. All of these items, aggregating $227,222.50, the plaintiff seeks to have deducted from its gross income as additional costs of timber

purchased of Patton & Gulnac. The items will have to be considered separately. It is my view that the total cost of the 1919 wood (the last cut by Patton & Gulnac), as measured by the original contract price, plus all other sums allowed Patton & Gulnac under the modified agreement of July, 1918, as to prices, should be allowed as a deduction from gross income for cost of timber purchased. This, as I understand it, would include the item of $96,523, less an admitted error of $35,758.48, plus $19,799.-70, and including, of course, the original contract price which was allowed by the commissioner.

■ The amount of advancements over and above amounts agreed to be paid—represented, I believe, by the item of $90,952.95 —should be treated as a debt, possibly a bad debt, due from Patton & Gulnac to the plaintiff, canceled by the settlement agreement of April 26, 1920, and carried with the $25,000 paid in cash at the time, to capital account on the books of the plaintiff. Had the plaintiff regarded this as a worthless debt, and charged it off within the year, the claim might have had a different standing. I do not consider that under the statute and regulations it can now be treated as cost of goods purchased. The plaintiff admits that the $25,000 cash payment to Patton & Gulnac as a part of the consideration for the April 26th release should be carried to capital account and not regarded as cost of wood purchased, and the discharge of the $90,000 claim at the same time would seem to be in the same category. The fact that the interest of Patton & Gulnac in the township under their contract of purchase of one-half was really valueless from a timber point of view, because the town, on the calculation of the plaintiff (which seems to be correct), would never pay for itself, does not affect this position. There was a technical claim on the title, apparently of sufficient value to induce the plaintiff to pay $25,000 and release a considerable claim, carrying the whole matter to investment account; and there is no evidence that any lawsuit was impending and thus settled, nor is there any evidence in the case that Patton & Gulnac were execution proof. There is evidence that in 1918 they could not carry on under their contract, but that is all.

The defendant strenuously urges that the same considerations apply to the items comprising the advances to Patton & Gulnac under the new arrangement of 1918, by which larger sums were to be allowed and

credited for wood, and says that the wording and the consideration named in the settlement contract actually include them. That may be true, but that would not have estopped Patton & Gulnac from showing that so much of the consideration as represented those items was in fact something that they were entitled to by agreement, and did not represent an ordinary debt for money advanced, as did the other part of the consideration referred to. There is nothing in this settlement contract to change the status of the items of allowances up to the agreed amount, and it will be noticed that the plaintiff did not carry these items to capital account as it did the others.

As to the claim that the plaintiff should be allowed to deduct $19,946.85 additional allowances for wood delivered in 1918, this amount having been credited in 1920, I agree with the defendant that it cannot be deducted. The wood was delivered in 1918, and should have gone into the cost of wood for that year, and was deductible then. It has been held by the Board of Tax Appeals that, where a taxpayer makes return on an accrual basis, as in the case here, charges incurred in one year, but entered on the books of the taxpayer the next year, are deductible when incurred and not when entered on the books. Wolf Mfg. Co., 10 B. T. A. 1161.

### 1920.

The plaintiff makes an alternative claim that, if it is not entitled to deduct it in 1919, it should be allowed to deduct the sum of $130,699.50 ($90,952.95 plus $39,-746.55) in 1920, on the ground that it was either a loss (because of no chance of recovery) or an ordinary and necessary expense of business in severing an undesirable business relationship which might possibly end in litigation.

I cannot sustain this claim on either ground. The item of $39,746.55 is made up of two sums, $19,946.85 credited in 1920 as additional allowance for wood delivered in 1918 (which I have disallowed for reasons already stated), and $19,799.70, which I have allowed for other reasons. The large item of $90,952.95 must be disallowed for this year also. There is no evidence to support the suggestion that it was either a loss beyond recovery or that litigation was impending.

I have not attempted to give in detail the many figures involved in these cases, nor anything more than principles which I consider should be established for the guidance of the parties in making recalculations, which they have indicated they desire to do. Certain sums are admitted to be due the plaintiff which I have not adverted to. That is covered by stipulation. After recalculations are made, such decrees will be made as are considered necessary.