741 P.2d 1289

Carmen Estelle SUCHAN,
Plaintiff-Appellant,

v.

George A. SUCHAN,
Defendant-Respondent,

and

Frank Suchan and Myra Suchan,
Intervenors-Respondents.

Carmen Estelle SUCHAN,
Plaintiff-Appellant,

v.

Frank SUCHAN and Helen Joyce Suchan,
husband and wife, and Minidoka Coun-
ty Sheriff, Ray Jarvis, and George Su-
chan, Defendants-Respondents.

Carmen Estelle SUCHAN,
Plaintiff-Appellant,

v.

George A. SUCHAN, Frank Suchan,
and Myra Suchan,
Defendants-Respondents.

Nos. 15460, 15512 and 15143.

Supreme Court of Idaho.

March 11, 1986.

On Rehearing July 14, 1987.

Richard K. Smith, Burley, for Carmen Suchan.

Larry Robert Duff, Rupert, for Frank and Helen Suchan.

Charles H. Creason, Jr., Rupert, for Sheriff Jarvis.

Roger D. Ling, Rupert, for George Suchan.

Alan C. Goodman, Rupert, for Frank and Myra Suchan.

HUNTLEY, Justice.

The magistrate court entered a judgment and decree of divorce on March 22, 1982 dissolving the twenty-eight year marriage of George and Carmen Suchan. After a hearing in which George and Carmen pro-

posed distributions of the property the magistrate entered a document entitled "Partition Order" on March 10, 1982. Carmen's attorney had drafted the order which awarded each party a value of $445,844.40.

George was awarded personal property, including farm equipment, plus all the community real property. George was directed to assume all community debts, including the outstanding mortgages on the real property. The order stated explicitly the magistrate court's intent that George have immediate possession of all the real property so he could continue farming.

The order awarded Carmen various items of farm equipment and other personal property and directed George to pay Carmen $373,739.40 essentially representing the value of Carmen's community property interest in the farm land awarded to George. George was to pay Carmen $100,-000 within forty-five days of the order and to pay the balance of $273,739.40 in twenty annual installments, with twelve percent annual interest. The order required George to execute a promissory note for this balance, secured by a mortgage on all the real property awarded him by the order.[1]

After contacting various lenders, George could not obtain a loan to make the $100,-000 payment within the forty-five day limit. The magistrate court, on July 8, 1982, issued an order to show cause as to why the court should not hold George in contempt for his nonpayment of the $100,000, and why immediate payment should not be ordered, even if that would require immediate sale of the real property. George filed a motion to stay further proceedings upon the judgment and partition order. He argued a sale would irreparably injure him.

The magistrate court, on July 22, 1982, granted a stay of execution pending George's appeal of the judgment and partition order. However, the court required that George post a supersedeas bond of

$150,000 to cover the amount of the judgment, costs of appeal and any damages resulting from the appeal. At Carmen's request the magistrate court issued a supplemental order to the order granting stay of execution which provided Carmen's money judgment would accrue interest at eighteen percent per year from the date of the partition order to the date of the $100,000 payment.

On August 30, 1982 the district court affirmed the judgment, divorce decree, and partition order. George appealed to this Court, which affirmed the district court in *Suchan v. Suchan*, 106 Idaho 654, 682 P.2d 607 (1984).

On November 8, 1982, Carmen, having received no money from George (or his promissory note or mortgage) obtained a writ of execution for the sale of George's real and personal property. Carmen sought payment of the initial $100,000 plus eighteen percent annual interest on the entire award of $373,739.40 from the May 10, 1982 date of the partition order to the date of payment of the $100,000. Notice of the execution sale was published with the sale date set for December 15, 1982. On that date the sale took place, in the face of George's inability to show cause why the sale should not proceed and his inability to post the supersedeas bond.

The sale brought in $60,552.50 for George's farm machinery and his 868 acres. George directed the sheriff to sell the land in seven parcels. George's brother, Frank Suchan, bought 820 acres in six parcels for a total of $13,500, subject to outstanding mortgages. Amalgamated Sugar Company bought the seventh parcel for $28,000, subject to its assumption of certain indebtedness. The sheriff returned the writ of execution unsatisfied.

Within forty-eight hours of the sale, George quitclaimed his right of redemption in the real property executed upon to his brother, Frank, and his mother, Myra Suchan, for a total of $2,000.

1. The title of "Partition Order" was somewhat of a misnomer in that it did not effect a partition of the real estate.

About a week later, on December 23, 1982, Carmen presented to George a promissory note, mortgage and other security instruments for his signature. George refused to execute them on the grounds the execution sale divested him of any mortgageable interest he had in the property. In response Carmen sought to have George held in contempt of the partition order and to obtain a court order requiring his execution of the documents. The magistrate court, in an order dated February 4, 1983, held George was not in contempt and refused to require him to sign the instruments.

Meanwhile, on January 24, 1983, Carmen also began proceedings for vacation of the execution sale for inadequacy of price coupled with alleged irregularities in the sale. On April 1, 1983, the magistrate court denied Carmen's motion.

On January 25, 1983, Carmen brought an independent action in district court. She alleged George fraudulently conveyed his statutory right of redemption in the property sold at execution to his brother, Frank, and his mother, Myra. The district court held (both initially and again on reconsideration) Carmen could have no interest in George's right of redemption and therefore lacked standing to allege its fraudulent conveyance. The appeal designated Supreme Court No. 15143 arose from that decision.

Carmen then appealed to the district court from the magistrate court's refusal to vacate the execution sale and its refusal to order George to execute a note and mortgage. The district court affirmed the magistrate court ruling that the partition order immediately conveyed Carmen's undivided one-half community real property interest to George and awarded a money judgment to Carmen. The court also held Carmen had no interest in the real property sold at execution and that the sale divested George of any mortgageable interest in the real property awarded him under the partition order. Because George had no mortgageable interest, the court could not re-

quire George to execute a mortgage after the execution sale. The district court also refused to vacate the sale on grounds of law or equity. Appeal No. 15460 arose from that decision.

Before the district court entered the latter opinion, Carmen filed a petition for writ of mandate and an alternative complaint for quiet title and moved for summary judgment with respect to each. The district court held the prior ruling that the partition order conveyed Carmen's one-half community property interest to George was dispositive of this issue in favor of George. With respect to the quiet title action, the decision from which case No. 15460 arose held Carmen had no mortgage interest in the property sold at execution. The district court ruled that it therefore followed that Carmen could therefore not be a redemptioner under I.C. § 11–401(2). Finally, the district court held Carmen had no subsequent judgment lien for the $273,739.40 remaining due after she had executed upon George's land for the initial $100,000 payment. Appeal No. 15512 arises from those rulings.

## ISSUES ON APPEAL

This case presents the issues of whether the lower courts erred in: (I) interpreting the partition order as itself immediately conveying certain real property to respondents and in ruling Carmen had no judgment lien in the real property after its execution sale; (II) refusing to vacate the execution sale of that property based on an allegedly inadequate price coupled with irregularities in the sale; (III) ruling appellant had no equitable mortgage in the property sold; (IV) ruling appellant held no mortgage interest in respondent's statutory right of redemption; and (V) determining appellant was not a redemptioner with respect to the property sold.

## I. CARMEN SUCHAN'S INTEREST IN THE REAL PROPERTY SOLD AT EXECUTION

After the execution sale, Carmen Suchan sought, in magistrate court, an order to

show cause as to why George Suchan should not be held in contempt for refusing to execute a mortgage securing Carmen's alleged interest in all the real property awarded George by the partition order. The partition order directed that the $273,739.40 portion owed Carmen be reduced to a promissory note and "secured by a real estate mortgage on *all* of the real property awarded to the Defendant...." (Emphasis added.) The magistrate court interpreted the partition order as having immediately conveyed Carmen's undivided one-half community real property interest to George. The magistrate found that all the real property awarded to George by the partition order had been sold. Since the only real property awarded to George by the partition order was Carmen's one-half community real property interest, the magistrate necessarily determined the partition order had conveyed that property to George. (The magistrate concluded George had no real property interest in which to give Carmen a mortgage interest.)

## A. CARMEN'S INTEREST BEFORE EXECUTION

■ In Supreme Court No. 15460 Carmen argues the magistrate court misinterpreted the partition order as immediately conveying Carmen's community real property interest to George. The standard of our review of the magistrate courts' interpretation depends upon whether the order contained an ambiguity. The rules of construction of contracts and written documents in general apply to the interpretation of court orders. *Evans v. City of American Falls, Idaho,* 52 Idaho 7, 18, 11 P.2d 363 (1932); *In re Callnan's Estate,* 70 Cal.2d 150, 74 Cal.Rptr. 250, 449 P.2d 186 (1969); *Fidelity Union Trust Co. v. Byrne,* 76 N.J.Super. 256, 184 A.2d 163 (1962). Interpretation of an ambiguous document presents a question of fact. *Cf. Roberts v. Hollandsworth,* 582 F.2d 496, 499 (9th Cir. 1978) (contract case); *Pollard Oil Co. v. Christensen,* 103 Idaho 110, 115, 645 P.2d 344, 349 (1982) (contract case). On the other hand, interpretation of an unambiguous document presents a question of law. *Cf. Suchan v. Suchan,* 106 Idaho 654, 660, 682 P.2d 607, 613 (1984) (contract case); *Beal v. Mars Larsen Ranch Corp., Inc.,* 99 Idaho 662, 668, 586 P.2d 1378, 1384 (1978).

Determination of whether a document is ambiguous is itself a question of law. *Cf. Pocatello Industrial Park, Co. v. Steel West, Inc.,* 101 Idaho 783, 789, 621 P.2d 399, 405 (1980) (contract case). We now turn to those provisions of the partition order awarding to George Carmen's one-half community real property interest to determine whether they are ambiguous. *Rutter v. McLaughlin,* 101 Idaho 292, 293, 612 P.2d 135, 136 (1980) (contract case). Carmen strenuously argues the conveyance of Carmen's interest to George was "subject to," or conditioned upon, George's payment of the initial $100,000, and his execution of a promissory note for $273,739.40 and a mortgage interest in all the real property awarded to George by the partition order. Carmen cites the following language of the order:

> The Defendant [George] is awarded as his sole and separate property the following real estate *subject to* the payment of all outstanding encumbrances thereon, and the payment and security provisions hereinafter required to be made by him for and on behalf of Plaintiff. (Emphasis added.)

The order goes on to identify the security provisions referred to above:

> DEFENDANT IS ORDERED TO PAY PLAINTIFF: the sum of $100,000.00 cash within forty-five (45) days of the date of this order. The balance of the Plaintiff's community interest in the sum of $273,739.40 shall be paid to the Plaintiff [Carmen] by the Defendant [George] in twenty (20) annual installments.... The balance shall be reduced to a promissory note to be secured by a real estate *mortgage* on *all* the real property awarded to the Defendant [George].... (Emphasis added.)

Carmen asserts the order unambiguously makes George's receipt of Carmen's inter-

est in the real property "subject to," that is, conditioned upon, George's first making the $100,000 payment and executing the note and mortgage. However, the first provision quoted above also makes the award of Carmen's interest to George "subject to the payment of all outstanding encumbrances thereon . . . ." These outstanding encumbrances consisted primarily of mortgages totaling over $100,000. The parties do not contend, and the record nowhere suggests, that George's payment in full of these outstanding encumbrances was a condition to his receiving Carmen's real property interest. In light of this, the "subject to" language conditions George's retention, rather than his receipt, of Carmen's interest upon George's payment of the outstanding encumbrances on the property. Since the "subject to" language also applies to George's execution of the mortgage, and since the magistrate likely intended "subject to" to have a single meaning, the order can reasonably be interpreted as conditioning George's retention, rather than his receipt, of Carmen's community interest upon George's execution of the mortgage at some appropriate time in the future (such as after the initial $100,000 payment).

Other language in the order suggests the issuing court intended the order to convey Carmen's interest to George immediately, and therefore prior to George's execution of the note and mortgage:

> IT IS ORDERED that the undivided one-half (½) interest of Plaintiff [Carmen] and Defendant [George] in the community property of the parties hereto, as decreed in the judgment and decree of divorce filed on the 23rd day of March, 1982, be, and the same *is* partitioned and *distributed* to the parties hereto subject to the conditions and terms as set out and required herein.
>
> . . . .
>
> The Defendant [George] . . . *has received* under the provisions of this partition, all of the farm real estate. . . . (Emphasis added.)

This language allows the reasonable interpretation that the order immediately conveyed Carmen's one-half community real property interest to George, though George had not yet executed a note and mortgage in favor of Carmen.

Additional language of the order, by negative implication, suggests the order did not condition George's receipt of Carmen's community real property interest upon George's execution of a note and mortgage:

> IT IS ORDERED that the down payment of the $100,000.00, hereinabove ordered, shall include the $30,000.00 for the home awarded to the Plaintiff [Carmen] as and for the community lien thereon. The Plaintiff [Carmen] shall, accordingly, execute and deliver a quitclaim deed conveying the *separate* property upon which the home is situated to the Defendant [George], upon the receipt of the down payment and delivery of the executed note and mortgage and related sales documents. (Emphasis added.)

This provision expressly conditions George's receipt of any interest Carmen might have had in George's *separate* real property upon George's execution of the note and mortgage. Nowhere does the order expressly condition George's receipt of Carmen's interest in the *community real property* upon George's execution of the note and mortgage. This suggests the drafter intended to omit the execution of the note and mortgage as a condition to George's receipt of *Carmen's community real property interest.*

■ The foregoing discussion shows one could reasonably interpret the partition order as requiring George to execute a note and mortgage in favor of Carmen as either a condition to George's receipt of Carmen's community real property interest, or merely as a condition to George's retention of that interest, after the order had immediately conveyed it to him. The order, being reasonably subject to conflicting interpretations, is ambiguous. *Rutter v. McLaughlin,* 101 Idaho 292, 293, 612 P.2d 135, 136

(1980) (contract case). On review we must therefore accept the magistrate court's interpretation unless clearly erroneous, particularly where he is interpreting his own order. I.R.C.P. 52(a) (1983); *Rueth v. State,* 103 Idaho 74, 77, 644 P.2d 1333 (1982); *Javernick v. Smith,* 101 Idaho 104, 106, 609 P.2d 171, 173 (1980).

The order's language provides substantial, though conflicting, evidence that the magistrate court intended the order to immediately transfer Carmen's community real property interest to George. Carmen directs our attention to nothing in the record making that interpretation clearly erroneous.

Moreover, the magistrate interpreted the order consistently with the general rule that written documents, if ambiguous, should be construed against the drafter. *Cf. Morgan v. Firestone Tire & Rubber Co.,* 68 Idaho 506, 519, 201 P.2d 976 (1948) (contract case). Carmen's attorney drafted the partition order. In light of this factor and the preceding analysis of the order's language, we affirm the magistrate court's interpretation of the order as immediately vesting Carmen's interest in the farm in George.

■ In Supreme Court No. 15512, Carmen argues the district court improperly invoked res judicata and collateral estoppel to bar her from litigating the issue of whether the partition order immediately conveyed her community real property interest to George. The district court said the same issue had been fully and finally litigated by the same parties in the magistrate court. The magistrate court's opinion is discussed above. The magistrate court in its opinion dated February 4, 1983, held the order of partition conveyed and vested in George all of Carmen's interest in real property. Since we have found this conclusion supported by substantial evidence, we affirm the district court's decision from which the appeal designated Supreme Court No. 15512 arises.

## B. STATUS OF CARMEN'S JUDGMENT LIEN AFTER EXECUTION SALE

■ Carmen's attorney announced prior to the execution sale of each parcel of real property that it was being sold subject to Carmen's continuing lien. Carmen certainly had a judgment lien in the property prior to the execution sale because her lien provided the very basis for the execution sale itself. *See* I.C. §§ 10–1110 (1982); 11–101 (1982); 11–104 (1982); 11–201 (1982); 11–301 (1982).

However, the Idaho Code entitled Carmen to a judgment lien in the property of only the judgment debtor, George. *See* I.C. § 10–1110 (1982). Since judgment liens are creatures of statute, Carmen's rights must be adjudicated within the statutory framework. *Messenger v. Burns,* 86 Idaho 26, 29, 382 P.2d 913, 914–15 (1963). Once George's property was sold at execution and the certificate of sale was delivered to the execution purchaser, conveying legal title to him, then Carmen lost her judgment lien against the property sold. *See* I.C. § 10–1110 (1982); *Petty v. Petty,* 70 Idaho 473, 478–79, 223 P.2d 158, 160–61 (1950).

Furthermore, Carmen levied execution on George's property for satisfaction of his matured debt of $100,000 plus interest. By her failure to bid the $100,000 plus interest, Carmen did not preserve her judgment lien for this amount. Therefore, she retained no lien in the property sold at execution. It should also be noted that George's remaining debt of $273,739.40 had not matured at the time of the execution sale. (The partition order contained no acceleration clause.) Hence, the remaining debt could not have been the basis of a judgment lien in favor of Carmen at the time of execution. Furthermore, by the time the initial installments of the $273,739.40 debt became due, George, the judgment debtor, had no interest in the land previously sold at execution. Carmen could not have had a lien in property no longer owned by the judgment debtor. *See* I.C. § 10–1110 (1982).

## II. EXECUTION SALE

In Supreme Court No. 15460, Carmen argues for reversal of the district court's

affirmance of the magistrate court's refusal to vacate the execution sale. She asserts the grossly inadequate sale price coupled with irregularities in the sale requires vacation of the sale.

■ Carmen focuses on two alleged irregularities. First, she alleges she proceeded with the execution sale laboring under an interpretation of the partition order subsequently rejected by the courts, all to her detriment. However, Carmen's misunderstanding of her legal rights, though unfortunate, is not an irregularity in the sale itself, particularly since she was represented by counsel at all stages.

The second irregularity alleged by Carmen is that a 494 acre farm tract irrigated from a single well was sold in several 160 acre parcels, all but one of which lacked an independent source of water. This, combined with the alleged grossly inadequate sale price, justifies vacation according to Carmen.

In general, gross inadequacy of price coupled with irregularities in the sale warrants vacation. *Gaskill v. Neal,* 77 Idaho 428, 432, 293 P.2d 957, 960 (1956); The *Federal Land Bank of Spokane v. Curts,* 45 Idaho 414, 425, 262 P. 877, 880 (1927). Whether to set aside an execution sale lies largely within the trial court's discretion. *Gaskill,* 77 Idaho at 433, 293 P.2d at 960.

■ In both *Gaskill* and *Curts* the sheriff conducting the execution sale sold the property in parcels, rather than as a unit, at the direction of persons not authorized to direct the manner and order of sale. Each court held this to be an irregularity in the sale. In the instant case, George, the execution debtor, directed the order of sale of parcels under the express statutory authority of I.C. § 11–304 (1982). In *Gaskill,* a house and garage lay partly on each of the two parcels sold. No similar factor exists in this case. The sheriff in *Gaskill* and *Curts* also improperly ignored the highest bid offered at the sale and instead accepted a much lower bid. This irregularity did not occur in the instant case, where the sheriff accepted only the highest bid.

Real property at execution must be sold in known lots or parcels. I.C. § 11–304 (1982). The factors indicating land does not consist of known lots or parcels include the fact the land is contiguous; owned and farmed as one tract; or that marks or circumstances are not available to ·distinguish one lot from another. *Curts,* 45 Idaho at 424, 262 P. at 880. In the instant case, although the land was contiguous, it had been leased out and farmed in several parcels on prior occasions. Furthermore, the magistrate court found the boundaries of the parcels were established by survey markers as well as farm and county roads. The notice of sale itself, drafted by Carmen's counsel, described the land in five separate parcels, and the land was sold in those same parcels.

Carmen also asserts several parcels were not economically viable units, that is, units adapted for separate and distinct enjoyment, because they lacked independent water sources. However, George announced before the sale of each parcel lacking an independent water supply that arrangements would be made for the parcels to · continue receiving water from the central well for a reasonable price. George had made such arrangements with lessees of portions of the very same parcels in prior years. As a result, the magistrate court found the 160 acre parcels were farmable units and there is substantial competent evidence in the record to support that finding.

In general, parcels not adapted for separate and distinct enjoyment should be sold as a unit. However, under I.C. § 11–304 if the party directing the order of sale can show in an intelligible manner the particular way in which the property can be profitably sold in parcels, the general rule will not apply and the sheriff must follow his directions. *Gaskill,* 77 Idaho at 432, 292 P.2d at 960. Three of the lots sold without an independent water source had no encumbrances upon them. George might reasonably have believed the sale of unencumbered property and parcels would re

sult in the highest possible bids, while minimizing the amount of property sold to satisfy Carmen's lien. Selling in parcels probably also placed individual parcels within a price range of more bidders. Greater numbers of bidders could reasonably be expected to increase bid amounts. Therefore, the sale in parcels, even if those parcels were not adapted for separate and distinct enjoyment, was a reasonable means of selling the land profitably. Hence, it was not irregular. *Gaskill*, 77 Idaho at 432, 293 P.2d at 960.

▮ Carmen asserts the sale brought a grossly inadequate price, which when coupled with the alleged irregularities, requires us to set aside the sale. In *Gaskill*, the sale brought $426.12 for $11,000 worth of property, less than four percent of the value. In *Curts*, the sheriff ignored a bid of $8,700 (suggesting a minimum value for the land) and accepted a $300 bid for 240 acres of land—again less than four percent of the value, conservatively assuming the land was worth at least as much as the ignored bid. (The sheriff ignored the bid because it was written and the bidder was not present at the sale. The court held the sheriff should have accepted the bid.)

At the sale in issue, Frank Suchan bought 800 acres for $12,000 and assumed an outstanding mortgage of $59,000. This made the effective purchase price $71,000. While the land had been appraised at the time of the partition order at $680,000, evidence of the value at the time of sale put the value at about $300,090. Several factors could explain the low purchase price: (1) a water permit allowing irrigation of only 480 acres (though 494 acres were irrigated in fact); (2) depressed market prices for farm land; (3) rock outcroppings on the land; (4) the fact Carmen's attorney announced prior to the sale of each parcel that it was being sold subject to Carmen's continuing lien; and (5) the fact forced sales commonly produce low prices. In light of these factors relevant to the adequacy of price, and Carmen's failure to prove any irregularity in the sale, we can-

not say the magistrate court abused its discretion in refusing to vacate the execution sale. *Gaskill*, 77 Idaho at 433, 293 P.2d at 960.

## III. EQUITABLE MORTGAGE

Carmen asserts the partition order entitles her to a mortgage interest in all the real property awarded George by the order. The order directed George to execute a note and mortgage in favor of Carmen in the amount of $273,739.40. George never executed the note or mortgage.

▮ A mortgage interest can exist only in real property capable of being transferred. I.C. § 45–1001 (1982–83). The execution sale divested George of all the real property awarded him by the partition order, except for his right of redemption. He conveyed that away two days after the sale. Since George has no interest in the real property awarded him, he cannot be compelled to execute a mortgage on that property.

▮ Carmen argues in the alternative for an equitable mortgage. If the magistrate court intended the order of partition to create a mortgage, which later turned out to be legally ineffective, then an equitable mortgage might have arisen. The four prerequisites of an equitable mortgage are: (1) intent of the court to create a mortgage; (2) a debt, definite in amount, due from the mortgagor to the mortgagee; (3) a definite parcel of real property to which the mortgage can attach; and (4) the mortgagor has an interest in the property capable of being mortgaged. *Orono Pulp & Paper Co. v. United States*, 34 F.2d 714, 717 (D.C.Me.1929); *Barnett v. Waddell*, 248 Ala. 189, 27 So.2d 1 (1946); *See Dickens v. Heston*, 53 Idaho 91, 21 P.2d 905, 90 A.L.R. 953 (1933).

▮ We look to the language of the partition order to gather the issuing court's intent. The order instructed George that "The balance [due Carmen after the initial $100,000 payment] shall be reduced to a

promissory note ... to be secured by a real estate mortgage on all the real property awarded to the Defendant [George]." The issuing court certainly intended that George create a mortgage at some future time, such as after the $100,000 payment. However, neither the language of the order nor the circumstances existing at the time of its preparation support the conclusion that the magistrate court intended the partition order itself to create a mortgage. Instead the order directed George to execute a mortgage instrument which would itself create the mortgage. We therefore affirm the decisions of the magistrate and district courts finding Carmen not entitled to an equitable mortgage.

## IV. MORTGAGE INTEREST IN GEORGE'S STATUTORY RIGHT OF REDEMPTION

In the district court Carmen brought suit alleging George fraudulently conveyed his statutory right of redemption in the real property sold at execution. George conveyed that right to his brother, Frank, and his mother, Myra, within two days after the execution sale. In response to Carmen's suit, George moved for summary judgment.

The district court reviewed Carmen's legal rights and determined she had no right to levy upon George's right of redemption. Absent an interest of Carmen in George's redemption right, the district court concluded Carmen had no standing to allege fraudulent conveyance of the redemption right and granted George's motion for summary judgment.

On appeal in Supreme Court No. 15143 Carmen asserts the district court decided the wrong legal issue. Carmen argues that although she may not have had a right to levy on George's redemption right, as decided at trial, she nevertheless had a mortgage interest in it. Carmen reasons that the execution sale involved a levy upon George's land only for the initial $100,000 payment plus interest. George still had an obligation to execute a mortgage securing

Carmen's remaining judgment amount of $273,739.40 in any realty awarded George by the partition order remaining after the execution sale, such as his right of redemption, according to Carmen.

If real property is transferable, then it is mortgageable. I.C. § 45–1001 (1982); *Evans v. Humphrey*, 51 Idaho 268, 272, 5 P.2d 545 (1931). Carmen concludes that George's right of redemption, a transferable right, was subject to her mortgage interest. However, as previously discussed, George transferred his right of redemption prior to executing any mortgage in favor of Carmen. He no longer had an interest in which to give Carmen a mortgage. Furthermore, Carmen is not entitled to an equitable mortgage for reasons previously discussed. Therefore, Carmen had no mortgage interest in the right of redemption which George conveyed away.

## V. CARMEN'S REDEMPTION RIGHTS

Carmen asserts she has redemption rights in the real property sold at execution. The statute applicable to this issue says:

> 11–401. Redemption—Persons entitled to make.—Property sold subject to redemption, as provided in section 11–310, or any part sold separately, may be redeemed in the manner hereinafter provided, by the following persons, or their successors in interest:
>
> ....
>
> 2. A creditor having a lien by judgment or mortgage on the property sold, or some share or part thereof, *subsequent* to that on which the property was sold. The persons mentioned in the second subdivision of this section are, in this chapter, termed redemptioners.

Carmen argues the partition order's distinction between the $100,000 initial payment and the amount of $273,739.40 to be paid over twenty years and secured by a note and mortgage constituted two separate judgments. She asserts the award of the $273,739.40 was a judgment subsequent to the award of $100,000.

The partition order identifies the $100,000 as a "down payment" and the $273,739.40 as the "balance." These terms are generally used to identify different parts of a single judgment, not to identify two judgments. Furthermore, the proceedings below consistently refer to Carmen's interest as "a" lien or "the" money judgment. Therefore Carmen had only one lien, the one which she executed. She had no liens separate from or subsequent to the liens she executed upon. She is therefore not a redemptioner under I.C. § 11–401(2).

Affirmed. Costs to respondents. No attorney fees awarded.

DONALDSON, C.J., and SHEPARD, BAKES and BISTLINE, JJ., concur.

SHEPARD, Justice, specially concurring.

I concur in the opinion of the majority since the attitudes of the parties and the now interposition of the property rights of third parties have, in my view, made any other disposition impossible. I suggest, however, that this is a black day in the history of justice in the state of Idaho.

The parties came to the courts seeking a divorce and a division of property valued in the vicinity of one million dollars. It was clearly the intent of the parties, and the object of the court, to obtain an equal division of the community property. The court intended that the defendant husband be awarded the real property so that he could continue in the farming business, and that the defendant husband should pay the plaintiff wife half the value of the real property. Froward circumstance, probably compounded by the attitudes of the parties, defeated the court's attempt to do justice. As I view the record, the defendant husband is left with none of the erstwhile community property, and has an outstanding judgment against him in the amount of approximately $300,000.00 in favor of his ex-wife. The former wife is left with her one-half share of the farming equipment, valued at the time of the divorce at approximately $60,000.00, the approximately $60,000.00 realized from the sheriff's sale, and a $300,000.00 judgment against her ex-husband who is probably judgment proof. Such is far from an ideal application of our system of justice.

With the benefit of 20/20 hindsight, it is my belief that the trial judge, when it became obvious that disaster was about to strike and make a shambles of his intended results, should have seized control of the situation on his own volition and revised and amended the judgment in such a manner as would more adequately implement the hopes of the parties and intention of the court. If the property could not in fact be sold for a sum even approaching the original valuation, then an amended decree and judgment should have so modified the amounts of money payable. The court might in an amended judgment have required the property to be sold through a process other than a sheriff's sale where the price was undoubtedly severely further depressed. At the least the court might have considered the possibility of division of the real property in kind, much as the court divided the farm equipment in kind between the parties. While as aforesaid, this Court has the benefit of 20/20 hindsight, I cannot believe but that a better result reflective of justice could have been obtained.

ON REHEARING

I

Appellant's Petition for Rehearing having been granted, and oral argument having been held, the Court continues to adhere to the views expressed in the Court's opinion issued March 11, 1986.

II

▇▇ The Court is aware that the parties have worked themselves into a procedural morass which, when coupled with the collapse in market value of agricultural assets, has brought about an end result which in many respects was detrimental to

both parties. Given the substantial period of time which has elapsed since the original entry of the magistrate court's judgment in this matter, there may well have been a substantial change in circumstances, which, if the trial court were able to re-evaluate the judgment, might impel the court to modify the disposition of assets in its original judgment in order to achieve a more equitable disposition of the assets in this matter.

Accordingly, in view of the unusual circumstances in this equity case, upon issuance of this Court's remittitur in these appeals, the magistrate court shall have jurisdiction for ten days to entertain any motion to alter or amend the judgment herein, pursuant to I.R.C.P. 59(e). In the event that such a motion to alter or amend the judgment is timely filed, and the magistrate court shall deny the same, such order of denial shall be non-appealable and the judgment in this matter shall become final. However, in the event that such a motion to alter or amend the judgment is timely filed, and the trial court on such rehearing alters or amends the judgment herein, then any new judgment entered shall be appealable as provided in I.R.C.P. 83(a).

Costs on rehearing to respondents; no attorney fees allowed.

DONALDSON, BAKES and HUNTLEY, JJ., concur.

SHEPARD, C.J., concurs only in Part I.

BISTLINE, Justice, dissenting.

Even though I am fully convinced that Carmen Suchan, beyond any doubt, is still the owner of all of the one-half undivided one-half interest of all of the real property which was awarded her by the decree of divorce entered in *Suchan I*, (other than a tract in which she transferred her one-half interest to Amalgamated Sugar Co.), I commend those in the majority for conferring jurisdiction upon the trial court to entertain motions to re-evaluate its judgment toward the end of achieving a more equitable disposition of the assets. Given that broad power, the trial court can undo what has been aptly described as "a black day in the history of justice in the state of Idaho." While I have agreed, and continue to agree with that portrayal, I have never agreed with the intimation that the trial court was solely at fault, and "should have ·seized control of the situation on his own volition and revised and amended the judgment in such a manner as would more adequately implement the hopes of the parties and intention of the court. If the property could not in fact be sold for a sum even approaching the original valuation, then an amended decree and judgment should have so modified the amounts of money payable. The court might in an amended judgment have required the property to be sold through a process other than a sheriff's sale where the price was undoubtedly severely further depressed. At the least the court might have considered the possibility of division of the real property in kind, much as the court divided the farm equipment in kind between the parties." If blame is to be placed, and clearly it should be, it should be spread evenly on each and all of the component parts of the judicial system, and also, but in smaller part, on the attorneys who although they have to take the system as it exists, are still entitled to cry out when the system appears to be malfunctioning.

Starting here, at the top echelon, in *Suchan I*, 106 Idaho 654, 683 P.2d 607 (1984), the appeal which we heard was taken by George Suchan on December 10, 1982, from a district court appellate decision of August 30, 1982, which affirmed the divorce decree earlier entered by Judge Donald Robert Workman, on August 2, 1982, (modified April 14, 1982), dividing property in a divorce proceeding, and holding certain real property was community property under the doctrine of transmutation. The appeal from magistrate court to district court was filed on May 13, 1982. That district court appellate decision was supplemented by an additional written opinion of

October 29, 1982. The appeal to this Court was filed December 10, 1982. The Notice of Appeal purportedly appealed directly from the trial court divorce decree, supplemental trial court findings and conclusions of April 14, 1982, and a Supplemental Order to Order granting stay of execution, dated July 30, 1982, and the district court's appellate decision.

The briefs in that first appeal to this Court discussed the Partition Order, but raised no issue thereon, and the Partition Order had not been appealed to the district court, which might have been thought to be a prerequisite to an appeal to this Court, unless we considered the Partition Order as an appendage of the divorce decree and judgment—a proposition never raised or discussed.

In short, there was in the 207 page record on appeal, a great amount of further proceedings which were taken in the trial court, and then in the appellate district court, which had nothing to do with the single issue presented to us in *Suchan I.* That voluminous volume of largely extraneous matter, together with comments in the briefs by counsel for both parties, was sufficient to apprise this Court that the decree of divorce which we were reviewing had not actually distributed what had been community real and personal property, and was not in and of itself a final decree when it was appealed to the district court. In that record before us, had it been observed, at page 111 was the very Order of Partition which we would eventually review in *Suchan II*, this case, and it was that order, and it alone, which was causing and would continue to cause "the procedural morass" into which this Court now states that the parties have brought themselves. We gave it *no* consideration whatsoever.

Even absent a motion by George Suchan in this Court for a stay order, there was enough extraneous matter in the clerk's order to apprise us that there were motions and orders in both the trial court and the appellate district court all at the same time, and that the same was likely still happening when and after jurisdiction was vested in this Court. The Partition Order had just been entered three days before the filing of the appeal to district court from magistrate court, and hence was on file when the jurisdiction of the district court was invoked by the notice of appeal.

After Judge Bruce resumed or assumed jurisdiction of the case as an appellate district judge, rather than as a trial district judge,[1] and while the appeal was pending before him, under date of July 8, 1982,

---

1. It was Judge Bruce who, when Carmen's complaint was filed in district court and not magistrate division thereof, issued a Temporary Restraining Order which prohibited George from interfering with Carmen's control of the parties' three children, *ordered* George out of the home, and restrained him from entering it or loitering near it. Judge Bruce also issued the usual Order to Show Cause in connection with the Temporary Restraining Order. At a November 5th hearing before Judge Bruce the Temporary Restraining Order was continued to be in effect, and George was ordered to pay child support. The parties went their separate ways, but had a mutual desire to attempt a reconciliation, and had agreed to engage in counselling.

Nine months later Carmen sought child support over and above the $600 per month earlier agreed to and ordered, because it was inadequate after she lost her employment at Sinclair Shutters, and had been unable to find other work. Judge Bruce, by order, set a hearing for early August, and following the hearing increased the child support to $1,000. Shortly thereafter, George's answer to the complaint was filed. A responsive pleading was quickly filed by Carmen on August 21st.

Over three months later, on November 30, 1981, an order by Judge Bruce was entered assigning the case to Judge Workman, a magistrate, who had had no previous connection with the case was entered. Judge Bruce presented no reason for his decision to duck out of a case which he had presided over from its commencement for the ensuing 13 months. It is surmised that he did so because he was asked to do so by the senior district judge, as the order intimates. Why, goes unanswered.

Judge Workman met with counsel on December 23rd, and a trial date was set for mid-February 1982. Evidence was taken over three days on hotly contested issues of child custody, and Judge Workman, six days later prepared his own findings, conclusions and judgment on child custody, visitation, and child support. Carmen was awarded custody of the children, and Judge Workman's findings and conclusions fully explained why.

Less than two weeks later he prepared and filed his extensive findings and conclusions rela-

Carmen obtained an order from Judge Workman which required George to show cause why he should not be punished for contempt of court in not having complied with the Partition Order which had not been appealed from specifically, but which was necessarily part and parcel of the divorce decree and judgment in order that it could be considered final for appeal purposes. Unless it was so considered, the appellate district court did not acquire jurisdiction. Only if the Partition Order was so considered did the appellate court have jurisdiction, but if so, then the trial court, Judge Workman, did not have jurisdiction other than to issue a writ of execution for the monetary judgment award of $100,000 which was incorporated in the Partition Order. Counsel who had taken over George's representation so understood. In retaliating against the issuance of the June contempt order, he moved for a stay order using this language:

COMES NOW the defendant George A. Suchan, and moves the court for an Order *staying all proceedings upon the Judgment and Partition Order appealed from* by defendant pursuant to Rule 62(d) and Rule 83(i), Idaho Rules of Civil Procedure and Rule 13 of the Idaho Appellate Rules, relating to the sale or disposition of the separate and community property as said Judgment and Order pertain to the real property of plaintiff and defendant on the grounds and for the reasons that substantial issues in regard to the character of said property and therefore the ultimate division of the property upon the divorce of the parties have been raised by the appeal and irreparable harm could be done to defendant by an involuntary sale or the disposition of the said property during the pendency of said appeal.

Both motions were heard at the same time, but only George's was granted, and

his attorney was directed to, and did, write the order which Judge Workman signed. Again similar language was selected by George's attorney:

A Judgment having been duly granted and entered in the above entitled action on March 22, 1982, and *an Order of Partition having been duly granted and entered pursuant to said Judgment* on the 10th day of May, 1982, ... (Emphasis added.)

It was "Ordered that all proceedings on the part of the plaintiff under said Judgment for the payment of money by defendant to plaintiff in the division of community property be stayed pending such appeal."

Carmen's motion, however, had not sought payment of the $100,000 which George was required to pay under the Partition Order, but was simply attempting to gain possession of the machinery and equipment which had been awarded to her by the Partition Order, and which George was continuing to use, and allowing his own sons to use. She wanted to sell it to meet a down payment on a home she had agreed to buy.

There was before us sufficient reason to take some affirmative action. This thought is fortified by the additional fact that when *Suchan I* was on its first level of appeal to the district court, counsel for George Suchan did apply for and obtain a stay order of the execution. In turn that stay expired after the district court appellate decision was entered. On the further appeal taken to this court from the district court affirmance, no stay was requested, and in continuing proceedings below the magistrate was required to interpret the Partition Order, and the plunge into the morass was well under way.

Moreover, and of concern on and beyond this particular case, there is no valid excuse for tolerating a system which allows for, as

tive to the issues presented as to property, the value of all parcels, its status as separate community, the many items of machinery, equipment, and other personalty including numerous policies of life insurance. All of this was em-

bodied in a judgment and decree of divorce, also prepared by Judge Workman. It was a monumental task which had been assigned to him.

here, a divorce action to be handled partly by a district judge, partly in the magistrate court, and then partly in the appellate district court, and also in this Court. If magistrates are given jurisdiction to try contested cases, one level of appeal should be done away with, and the first appeal should be directly to this Court. Pause to consider that had *Suchan I* been first assigned to the Court of Appeals, and on a review being granted here there would have been three levels of appeal. Had either Judge Bruce *or* Judge Workman been in sole control of this case, and not each been influenced by what each perceived to be the other's views on the Partition Order, the morass would likely not have come into existence.

I am in agreement with the Court's directive to the trial court on remand. I will mention that ten days in which to regroup and file motions is not overly magnanimous in view of the time lapse since the attorneys have been in contact with this case. However, once any motions are filed, the trial court will be in full charge as to the procedures to be thereafter filed, and the type of hearing which will be had. This Court has had jurisdiction of the case since March of 1984. That standing alone should imbue the trial court with the thought that a thorough re-examination of the whole case, including its own primary interpretation of the Partition Order, looking toward an equitable resolution that will be anything other than an uneven award of real property and the saddling of one party or the other with debt—recognizing, of course, that the parties only pursued that route in this case after the trial judge had been so persuaded by George's new attorney replacing his trial attorney.

The trial court should give favorable consideration to Justice Shepard's view of March 11, 1986, that "at the least the court might have considered the possibility of division of the real property in kind, much as the court divided the farm equipment in kind between the parties." The directions on remand allow the court to do so.

The trial court may well consider that counsel who had represented the parties throughout the divorce after the decree was entered, had both submitted propositions to the court which *were* based on an equal division. Many of this Court's cases say that it *should* be done, except where not feasible. Here, it will be mentioned again that after the decree was entered, George had substituted counsel, and it was new counsel speaking for George who persuaded the court to the view that a disparate award of real property with a compensating monetary award was the better way to go. And so the parties went deeper into the morass. At the same time George apparently ran head-on into the high-interest rates crunch which was likely not envisioned when the Partition Order was agreed upon by counsel and submitted for the court's signature. George was the person who should have requested that the Partition Order be rescinded. Instead, when faced with a contempt order, although he would have himself been excused because he allegedly could not come up with the $100,000 down payment, he did nothing, sought no judicial intervention to alleviate the situation. Instead, when his attorney somehow became of the opinion that the Partition Order gave Carmen's one-half undivided co-tenancy ownership over to George, the execution sale took place, George was happy, and undoubtedly his family happy, that they could now own all of the property, which prompted George to convey to his brother and mother his valuable right of redemption.

Judge Workman should have been well buoyed up with pride when our first opinion affirming was released. That opinion shows a considerable concern for the fact that the language of the Partition Order transferring Carmen's ownership in the realty was *subject to, that is conditioned upon, George's first making the $100,000 payment and executing the note and mortgage.* Our opinion labored mightily to work around the plain meaning of those words of art, and in doing so manufactured out of whole cloth a rationale which, basi-

cally out of deference, would support the holding of Judge Workman, who had not worked up any ratio decidendi for his own conclusion. At 106, 107 and 108, 741 P.2d at 1293, 1294 and 1295. March 1986 opinion. It was a tribute to Judge Workman that our opinion went to such lengths. But, we were careless. At 105, 741 P.2d at 1292 our opinion twice spoke of the property being community:

> The district court affirmed the magistrate court ruling that the partition order immediately conveyed Carmen's undivided one-half community real property interest to George and awarded a money judgment to Carmen.
>
> . . . .
>
> The district court held the prior ruling that the partition order conveyed Carmen's one-half community property interest to George was dispositive of this issue in favor of George.

At 105, 741 P.2d at 1292 this same misconception was repeated:

> The magistrate found that all the real property awarded to George by the partition order had been sold. Since the only real property awarded to George by the partition order was Carmen's one-half community real property interest, the magistrate necessarily determined the partition order had conveyed that property to George. . . .

The fallacy of those statements is that there was not any community property. Following the divorce all realty was separately owned. Most of it was the farm parcels, and George and Carmen each owned as co-tenants. The only separate property was the three-acre parcel with the residence on it which the divorce decree declared to be George's, subject to a $60,000 obligation of reimbursement to the community, which was also awarded $30,000 to George and $30,000 to Carmen. That was the fallacy.

Worse than the fallacy involved was the use made of it at page 9 in our attempt to fortify an impossible conclusion on the language that George would receive clear title to the three-acre residence by complying with the Partition Order's requirement that George execute a $273,739.40 note and mortgage to secure Carmen. That portion of the Partition Order reads:

> IT IS ORDERED that the down payment of the $100,000.00, hereinabove·ordered, shall include the $30,000.00 for the home awarded to the Plaintiff [Carmen] as and for the community lien thereon. The Plaintiff [Carmen] shall, accordingly, execute and deliver a quitclaim deed conveying the *separate* property upon which the home is situated to the Defendant [George], upon the receipt of the down payment and delivery of the executed note and mortgage and related sales documents. (Emphasis added.)

This provision expressly conditions George's receipt of any interest Carmen might have had in George's *separate* real property upon George's execution of the note and mortgage. Nowhere does the order expressly condition George's receipt of Carmen's interest in the *community real property* upon George's execution of the note and mortgage. This suggests the drafter intended to omit the execution of the note and mortgage as a condition to George's receipt of *Carmen's community real property interest.* The drafter was not Judge Workman, but Carmen's attorney. We were reasonably entitled to surmised, however, that neither of the attorneys would have drafted the order without some guidance, advice, or direction from the court itself.

But, carelessly, and acting out of what was thought to be justified deference, our opinion went on to say:

> The foregoing discussion shows one could reasonably interpret the partition order as requiring George to execute a note and mortgage in favor of Carmen as either a condition to George's receipt of Carmen's *community real property interest,* or merely as a condition to George's retention of that interest, after the order had immediately conveyed it to him. The order, being reasonably sub-

ject to conflicting interpretations, is ambiguous. *Rutter v. McLaughlin*, 101 Idaho 292, 293, 612 P.2d 135, 136 (1980) (contract case). On review we must therefore accept the magistrate court's interpretation unless clearly erroneous, particularly where he is interpreting his own order. I.R.C.P. 52(a) (1983); *Rueth v. State*, 103 Idaho 74, 77, 644 P.2d 1333 (1982); *Javernick v. Smith*, 101 Idaho 104, 106, 609 P.2d 171, 173 (1980). (Emphasis added.)

Carmen, of course, had no community interest, the instrument was not ambiguous, and we over-indulged in saying what we did. Even were there an ambiguity, the five of us with the legally-trained minds, could and should have reached a solution independent of Judge Workman's.

In furtherance of our attempt to uphold that which we believed was the magistrate's interpretation of his own handiwork, we even went so far as to draw our own inference supporting the magistrate by likening George's obligations to pay Carmen $100,000 and execute the note and mortgage as similar to his title being subject to the payment of all outstanding encumbrances thereon" (mortgages totaling over $100,000 to various creditors). Obviously, as I now see, with those encumbrances in place at the time of the divorce decree and still in place at the time of the Partition Order, the latter could not be interpreted as requiring George to forthwith pay the same off.

Carmen was, by the partition order, in turn required to convey title to her separate real property to George. George, or anyone to whom she might convey her interest in real property, would necessarily take it subject to encumbrances of record. And, on this second review, I observe that the order did not even purport to require any immediate payment of encumbrances; George was simply entitled to receive a deed of Carmen's undivided one-half interest in the real property which had been awarded to her by the divorce decree, and George would acquire her interest subject

to encumbrances already against it, and also subject to the note and mortgage which he was to give her in payment. A separate paragraph of the Partition Order, did order George "to *assume and pay* all of the outstanding indebtedness of the community as found by the Court in the decree of divorce, and to hold the Plaintiff harmless therefrom." The divorce decree, in awarding real property in undivided one-half interests, and in awarding certain personalty and equipment, had placed equal responsibility on both George and Carmen for the outstanding indebtedness.

Additional insight was gained by resorting to the briefs filed in *Suchan I.* Both the briefs of George and of Carmen made reference to the Partition Order, which instrument—filed in the record after the divorce decree had been entered—went unnoticed and unmentioned in our *Suchan I* opinion. George's appellant's brief, filed April 25, 1983, provides this account:

> On April 29, 1982 Roger D. Ling of the firm of Ling, Nielsen and Robinson was substituted in the place and stead of Lawrence H. Duffin of Burley, Idaho as husband's attorney and a response of husband to wife's Motion for Order of Partition was filed with the court. *On the 11th day of May, 1982 the lower court, after hearing, filed its Order of Partition dated May 10, 1982, granting to husband a* portion of the community personal property and *all of the community real property and ordering that husband pay to wife a sum equal to the value of her interest in said property awarded to husband. Suchan I*, Case No. 14890, Appellant's Brief, p. 2 (emphasis added).

Carmen's Respondent's Brief, filed May 12, 1983, put it differently (and with more detail and accuracy):

> *The decree awarded to each of the parties an undivided one-half interest in the community property,* both real and personal, undertook to divide some miscellaneous personal property, and quieted title in the Defendant to his sepa-

rate property (a 3–acre tract of real estate) subject to a lien in favor of the community in the sum of $60,000.00.

In addition the Court ordered the following:

"IT IS EXPRESSLY ORDERED that the community property of the parties hereto, not specifically designated for either of the parties herein, shall be placed for sale and sold at the earliest date, and in a manner calculated to derive the maximum available proceeds for distribution between the parties hereto.

"There shall be paid first from the proceeds of the sale of the community property, after the payment of all costs of sale, the indebtedness against the community, with the balance to be divided equally between Plaintiff and Defendant.

"IT IS FURTHER ORDERED that *if partition of the property appears more feasible and necessary to effect the efficient distribution* of the community property between the parties, *the Court will undertake the partition of the real and personal property of Plaintiff and Defendant upon motion of either of the parties hereto.*"

. . . .

George Suchan, through his attorney, Lawrence Duffin, moved the Court for an order altering and amending the Findings of Fact and Conclusions of Law which came on for hearing on the 5th day of April, 1982. *The order of the Court denying George Suchan's motion to alter or amend the Findings* of Fact and Conclusions of Law *was filed* on the 14th day of April, 1982, *together with the Court's Opinion and Supplemental Findings and Conclusions.*

On the 23rd day of April, 1982, Carmen Suchan moved the Court for an order of partition.

On April 29, 1982, Roger D. Ling, of the firm of Ling, Nielsen & Robinson, was substituted in the place and stead of Lawrence H. Duffin as George Suchan's attorney.

On April 29, 1982, George Suchan's response to the Plaintiff's motion for an order of partition was filed with the Court.

Carmen Suchan's motion for partition was heard on the 30th day of April, 1982.

*On the 3rd day of May, 1982, the Court was advised of the terms agreed upon by the parties for the division of their property, which included the purchase by George Suchan of Carmen Suchan's equity in the real estate and a physical division of the machinery.*

Thereafter, based upon the terms related to the Court by counsel, the Court filed its Order of Partition on the 11th day of May, 1982. *Suchan I,* Case No. 14890, Respondent's Brief, pp. 3–5 (emphasis added).

In a reply brief dated June 17, 1983, George contended:

It should be first pointed out that *husband has never sought to have any of the property found by the lower court to be community property to be divided* or the Decree of Divorce otherwise enforced. Wife did on April 23, 1982 file her Motion for an Order of Partition with the court. After the Motion for Partition was heard on the 30th day of April, 1982, the court entered its Order of Partition on the 11th day of May, 1982, whereby certain community property was awarded to husband and to wife and a judgment for the difference in values was awarded to wife against husband, allowing payment of the money judgment under certain terms provided therein. *At page 5 of wife's Brief, wife states that husband and wife agreed to the purchase by George Suchan of Carmen Suchan's equity in the real estate. This is not an accurate statement and is not supported by the record in this case. For reasons that may become apparent at a future date,* husband objects to this characterization of the facts by wife, even though such characterization *is not*

*relevant* to the issues in this case.[2] *Suchan I*, Case No. 14890, Appellant's Reply Brief, p. 1 (emphasis added).

It was truly irrelevant and received no mention in our opinion.[3] Although George's Notice of Appeal filed in this Court in *Suchan I* purported to include the Partition Order, George had not appealed that order from magistrate court to the district court. George appealed to the district court only "from the final Judgment entered ... on the 22nd day of March, 1982, and the Supplemental Findings of Fact and Conclusions of Law dated April 14, 1982...." The stated issues to be presented to Judge Bruce were only four in number:

(a) Whether there is substantial and competent evidence to support the Findings of Fact of the court.

(b) Whether the court erred in concluding that an "Agreement as to status of community property after death of one of the spouses" which is revoked by law upon divorce of the parties, constitutes a conveyance of appellant's separate property to respondent, thereby transmuting said property into community property.

(c) Whether the lower court erred in adopting the value of defendant's separate property by the expenditure of community funds as of March 10, 1982.

(d) Whether the Conclusions of Law are supported by the Findings of Fact. R., p. 122.

It was from Judge Bruce's decision affirming Judge Workman that we heard *Suchan*

*I* on those very same issues, and affirmed. Although the Partition Order had been entered three days before the appeal to Judge Bruce, no appeal was taken from it and Judge Bruce also gave it no attention in his appellate decision. Our *Suchan I* opinion was concerned only with what we were led to believe by the parties was the final judgment in the case, hence making it appealable. Only when *Suchan II* surfaced in this Court did we become apprised that the controversial Partition Order was entered pursuant to a paragraph in the trial court's (Judge Workman's) final judgment stating that the court, upon motion of either of the parties, would "undertake the partition of the real and personal property of plaintiff and defendant." Judgment and Decree, R., p. 87.

With the case having been removed from Judge Workman, and while it was before Judge Bruce on appeal, the judge having by order of June 8, 1982, set a briefing schedule and oral argument for July 26, 1982, Carmen filed an affidavit in the case (at all times one and the same case, No. 7934) which affidavit stated that George had not and would not comply with the Partition Order. No reason therefore appearing, it was Judge Workman, not Judge Bruce, who signed an order to show cause in re contempt directed to George. On the following day, July 9, George filed a motion to stay all proceedings until his appeal was decided by Judge Bruce. Not Judge Bruce, but Judge Workman heard both the contempt motion and the stay motion on

**2.** As appears *infra*, "the reasons that may become apparent" not disclosed were that Judge Workman and Judge Bruce, prior to the date of that brief, each apparently taking his cue from the other after counsel for George initiated the language, *infra*, at 121, n. 4, 741 P.2d at 1308, n. 4, had *sua sponte* started referring to the partition order as Carmen's *money judgment.* As also appears *infra*, *George Suchan*, first through Mr. Duffin and then through Mr. Ling, *submitted two different proposals for the partition of the then separately owned property of the parties.*

**3.** In George's Respondent's Brief filed in the instant appeal July 22, 1985, it is stated: *"The Idaho Supreme Court approved and affirmed the*

*Order of Partition which granted George an award of a disproportionate amount of the community property, subject to his obligation to pay Carmen half its value, secured by a money judgment.* Such an award has been approved by the Supreme Court on numerous other occasions." Case No. 15460, Respondent's Brief, p. 27. George's brief in this respect was guilty of attempting to lead us into believing that we *had done* something *which we had not done,* and to which we gave no consideration whatever in *Suchan I.*

George's 1983 brief did *not* attempt to raise any issue concerning the Partition Order; nor did Carmen's 1983 brief.

the same day, July 15. The court minutes of that date show the court's oral ruling that a stay would be granted until the appeal was decided, that George would be ordered to post bond in the sum of $150,000 —apparently as supersedeas for the stay order, and *Mr. Ling* was directed to prepare the orders. R., p. 137.

The order prepared by Mr. Ling, George's attorney, dated July 22, contained a long recital sentence and an order. The order stayed Carmen's efforts at obtaining compliance with the Partition Order, "on condition that" George furnish the $150,-000 undertaking. But the 16–line one-sentence recital of the order entered, which Mr. Ling captioned "ORDER GRANTING STAY OF EXECUTION," was also couched in language of George having appealed *from the Partition Order*—which he had not done. It did correctly recite the partition order's requirement of $100,000 to be paid on or before the 14th day of June, 1982. It recited the terms by which George would pay Carmen $273,739.40— but made no mention that the Partition Order required that this would be done by execution of a note in that amount, and a real property mortgage as security, both to be escrowed with appropriate conveyances from Carmen.[4]

Eight days later Judge Workman entered a supplement to the foregoing order which stated that until the $100,000 payment was made, the sum of $273,739.40 would bear interest at the statutory rate of 18 percent. This is difficult of comprehension, as the Partition Order was exceedingly clear that that $273,739.40 would be paid in annual payments, and interest thereon would accrue at *12* percent per annum on the unpaid balance. Moreover, it was not a judgment as such for that amount of money, but stated the terms and provisions of a promissory note which George was required to execute, with security which was practically all of the real property which after the divorce became separately owned undivided one-half interests—vested in Carmen and vested in George. At best, it was the court's judgment, per the partition order, that Carmen would be conveying separately owned undivided one-half property interest to George *in return for a sum of money to be paid by George per a $273,-739.40 note and mortgage*, and $100,000 down.

Enters next Judge Bruce on the scene in the same case but now before him as a one-judge appellate court, and hears oral argument on the appeal. On August 30, he renders his appeal decision affirming Judge Workman's divorce decree provisions which had declared the status of the real property involved and "dividing it," so to speak, by making George and Carmen co-tenants. No mention was made by Judge Bruce of the partition order—understandably because it had not been appealed. On Octo-

---

4. The recital of the Stay Order is in full:

A Judgment having been duly granted and entered in the above entitled action on March 22, 1982, and an Order of Partition having been duly granted and entered pursuant to said Judgment on the 10th day of May, 1982, in favor of Carmen Estelle Suchan, the plaintiff above named, and against George A. Suchan, the defendant above named, for the payment by defendant to plaintiff of the sum of $100,000.00 on or before the 14th day of June, 1982 and the payment of $273,739.40 in twenty annual installments, bearing interest at the rate of 12% per annum, and the defendant having appealed therefrom to the District Court of the Fifth Judicial District of the State of Idaho, in and for the County of Minidoka, and defendant having filed his Motion to Stay Proceedings pending appeal, and after hearing Roger D. Ling, counsel for the defendant, in support of said Motion and Richard K. Smith, counsel for the plaintiff, in opposition thereto, and on motion of the attorney for the defendant, it is.... R., p. 138.

This was a serious misstatement of the contents of the Partition Order, but harmless at this point. As is seen, the foregoing completely omitted any mention of the requirement of a note and mortgage, and other executory provisions in the order. This same order, without reference to the executory provisions, would sometime later be observed by the district court on the appeal to it, and would influence it to the belief that Carmen had a money judgment for a total of $373,739.40, whereas the money judgment was only for $100,000. Carmen was by judicial decree entitled to the note and mortgage in that amount—to be escrowed, but it was neither a collectible money judgment nor a secured note.

ber 29 by written opinion, Judge Bruce denied George's petition for rehearing.

While the appeal was pending before Judge Bruce, George did not post the required supersedeas bond, but Carmen nevertheless awaited out the decision on appeal. Not until December 6, 1982, did she renew her earlier attempt to obtain George's compliance with the Partition Order. Instead of pursuing George with another contempt process, she sought an order of the court which would allow her to proceed with an ongoing execution against the $100,000 money judgment incorporated in the Partition Order. Anticipating George's appeal to the Supreme Court from Judge Bruce's decision affirming Judge Workman, she sought to be relieved of the automatic seven-day stay period on filing of an appeal.[5] The execution proceedings had already proceeded to the stage of posting and publishing.

Carmen's supporting affidavit is absolutely clear as to the purpose of the execution proceedings: *"Plaintiff seeks thereby to execute on the initial $100,000.00, plus interest and costs which has been due and owing under the Court's Order of Partition* since the 24th day of June, 1982." R., p. 164. Judge Bruce signed the order to show cause directed to George.

By yet another affidavit of December 6, 1982, Carmen sought an entirely different order that:

> execution issue against the Defendant for the full sum of Plaintiff's community interest, *over and above the execution presently in progress,* by reason of the Defendant's failure, in any way, to obey the Order of Partition issued by the Court requiring the payment of money,

and execution of notes, mortgages, and security instruments in protection of Plaintiff's lifetime accumulation. R., p. 171.

No authority was filed by Carmen which would suggest in the least any legal principles or precedent which would authorize the Court to completely alter the Partition Order—which by that time was final and unappealable. Neither Judge Bruce nor Judge Workman acted upon it.

Notwithstanding George's filing of an appeal to this Court on December 10, 1982, Judge Bruce conducted a hearing "upon the order to show cause" seeking court approval to proceed with the pending execution on the $100,000, plus interest thereon. Judge Bruce heard from counsel and, on December 13, 1982, entered the following Order Allowing Execution Sale to Proceed:

> It appearing to the Court that a writ of execution issued on the 8th day of November, 1982, seeking enforcement of the Order of Partition entered in the above-entitled action and dated the 10th day of May, 1982; it further appearing to the Court that notice of appeal of the District Court Order affirming the Decree of Divorce was filed on December 6, 1982; it further appearing to the Court that *the sum sought in such execution is the sum of $100,000.00 plus interest at the rate of 18% per annum on the full judgment in the sum of $373,739.40* from the 10th day of May, 1982, and costs; [6]

The Court having been informed, in open court, that the Defendant could not post a cash deposit or supersedeas bond, and it appearing to the Court that the

---

5. Judge Bruce denied the rehearing on October 29. George had 42 days in which to appeal to this Court. As of the date of Carmen's affidavit, George had three days left in which to appeal. The appeal was filed on December 10—the last day. At oral argument on rehearing in *Suchan II,* Mr. Ling informed us that Carmen and her counsel had been advised that the appeal would be filed.

6. The recitation was patently incorrect. The execution papers, correctly read, showed that

the execution sought only to satisfy $100,000 and the interest which had accrued on $100,000. Strangely, Judge Bruce, in his appellate decision affirming a subsequent order of the magistrate, would write fourteen months later, on February 10, 1984, relative to the execution, that Carmen had the writ issued "so that the initial $100,000.00 payment might be made." R., Vol. 1, p. 179.

judgment sought to be enforced is a money judgment, and after hearing the argument of counsel, the Court being fully informed, and good cause appearing therefore,

IT IS ORDERED that the execution sale should proceed, as published and noticed, on the 15th day of December, 1982; R., Case No. 14890 (augmented into No. 15460) pp. 176–77 (emphasis added).

The Court minutes also make it absolutely clear that Judge Bruce was only considering the order to show cause why the pending and posted execution sale to satisfy the $100,000 money judgment should not take place, and was not considering the other order to show cause issued by Judge Workman. The court minutes are:

ORDER TO SHOW CAUSE WHY EXECUTION SHOULD NOT PROCEED EVEN IF NOTICE OF APPEAL IS FILED

Mr. Smith stated that he will stand on the affidavit pending proof.

Mr. Ling addressed the Court on preliminary remarks. States that they are unable to obtain a supersedeas bond for that amount of money, and they waive additional time to obtain bond at this time.

Mr. Smith again addressed the Court. States that *one Order To Show Cause was scheduled for District Court* and *the other one scheduled before the Magistrate Court*. Also addressed the issue on the bond and stated that there was never a bond posted on the appeal from Magistrate Division to the District Court. He feels that the execution should go forward.

Court stated that it hasn't considered the Order to Show Cause before the trial court, and that counsel can determine who should hear this.

Mr. Ling then addressed the Court and states he has no alternative, and would like to have Mr. Suchan testify.

Mr. Smith again addressed the Court. R., p. 178.

As mentioned, the appeal from the district court, Judge Bruce, to the Supreme Court was filed three days before Judge Bruce heard argument and ordered that execution could proceed, but the order to show cause signed by Judge Workman was never heard or considered, presumably because of the appeal from Judge Workman's court to Judge Bruce's court and also the appeal to this Court from Judge Bruce's court. And, although the appeal to this Court purported to appeal from the partition order, no issue regarding it was raised in the briefs, and the Partition Order went wholly unmentioned in *Suchan I.*

The writ of execution, which was not stayed but specifically allowed to go forward by Judge Bruce's order, was exactly as portrayed in Carmen's affidavit referred to above:

WHEREAS, the judgment roll in the action in which said Judgment and Decree, Order of Partition, and Supplemental Order to Order Granting Stay of Execution, are all filed in the Clerk's Office of said Court, in the County of Minidoka, State of Idaho, and said Judgment and Decree, and Order of Partition were docketed in said Clerk's Office, in the said County, on the days and in the year first above written, and *the sum of $100,000.00 with interest from May 10, 1982, at the rate of 18% per annum is now*, at the date of this writ, actually *due* on said Judgment and Decree, and Order of Partition together with the Supplemental Order of the Court thereto.[7] *Suchan I,* Case No. 14890, R., p. 191.

It has never been claimed that the Partition Order did not amount to a $100,000 money

---

7. At re-argument on rehearing, a question put to Mr. Ling was concerned with ascertaining whether the execution process included attempting satisfaction of anything over and above the $100,000 and interest thereon, *i.e.,* did or did it not include satisfying accrued interest on the $273,739.40 note which George was required to

execute, secure, and escrow. Mr. Ling, notwithstanding the documentation in the record, remained firmly and finally committed to the view that the execution included satisfaction of the 18% on the $273,739.40:

judgment. No one has contended that interest on a money judgment does not accrue interest at the rate of 18 percent per annum—which has been so since 1981 Idaho Sess.Laws, ch. 157, p. 269. The direction to the sheriff set forth in the writ was in conformance with the provisions of I.C. § 11–102, and instructed as follows:

NOW, YOU, the said Sheriff, are hereby required *to satisfy the judgment and order of the Court with interest as aforesaid,* and costs and accruing costs, out of the personal property of said GEORGE A. SUCHAN, judgment debtor, or if sufficient personal property of said debtor cannot be found, then out of the real property in your County belonging to said debtor on the day when said judgment and decree was docketed in Minidoka County, or at any time thereafter, and make return of this writ within sixty (60) days after the receipt hereof, with what you have done endorsed thereon. *Suchan I,* Case No. 14890, R., p. 191.

Upon receipt of the writ and pursuant thereto the sheriff filed with the county recorder a Notice of Levy which correctly recited that the writ had issued on the May 10, 1982 order, and that "there was, and now is due and owing the sum of $100,000.00 plus interest at 18% per annum from the 10th day of May, 1982." Case No. 14890, R., p. 192. The sheriff's performance of his duty is clearly portrayed in the usual time-honored language:

I HAVE HEREBY LEVIED *on all the right, title* and interest of Defendant in and to the following real property in the County of Minidoka, State of Idaho, to wit: (Emphasis added.)

On the same date that the writ issued and Notice of Levy was recorded, the sheriff also signed a Notice of Sale which contained the same recitations as the Notice of Levy, and added also that the Levy had been made and gave public notice as follows:

PUBLIC NOTICE is hereby given that I, the undersigned as the Sheriff of the County of Minidoka, will, on the 15th day of December, 1982, at 10:00 o'clock AM, of such day, at 413 West 100 South of Paul, Idaho, at the George A. Suchan residence, in the County of Minodoka, State of Idaho, *sell* at public auction, to the highest bidder, for cash, *all of the right, title and interest of Defendant in and to the above-described real estate* (following the sale of personal property as separately noticed) or so much thereof as may be necessary to raise sufficient money to satisfy such execution, together with interest and costs thereon. (Emphasis added.)

In handwriting on the Notice is the statement "Subject to liens on property."

The sale took place as scheduled. Personal property which had been levied upon was first sold, all to Dan Suchan or Frank Suchan, for $22,500. Thereafter, with George Suchan utilizing his right to direct the order of sale, the various parcels of realty previously levied upon were offered and sold. Frank Suchan bought a quarter-section for $5,000, one quarter-section for $2,500, two quarter-sections for $1,500 each, and finally a tract known as the Burton Property for $1,500. Amalgamated Sugar Company bought the final tract for a $25,000 bid, and all were given certificates

---

MR. LING: But we know that the Judge did not say, "You can buy from Carmen or Carmen can buy from you and if neither one of you buy the property then we'll sell it or something." It didn't say that. It did say, "Carmen is selling; George is buying. X number of dollars is a money judgment and George has the property." That's what we think it says, very clearly. "George you get the property. You owe her $373,000."

JUSTICE SHEPARD: Counsel, do I understand correctly that an execution was sought

and obtained? It was done on the basis not only of the $100,000, but also to collect the 18% per annum on the $370 odd thousand dollars?

MR. LING: That's correct. And the execution papers, the writ of execution shows the total amount due is 18% on 373 plus the $100,000, all of which were due at the time the writ of execution was prepared by Carmen's attorney and submitted to the clerk and signed, and the sale proceeded. Oral argument on rehearing, Sept. 2, 1986.

of sale. The sheriff returned the writ not fully satisfied by the amount of $75,439.13.

The controversy which thereafter ensued centered on a determination of what right, title, and interest in the real property sold at execution George Suchan owned on the date of the sale—which in turn requires a proper determination of the construction of the May 10, 1972 partition order. Judge Workman was the first judge to be called upon to determine the construction and legal effect of the May 10, 1982 order. Other courts in turn, including this Court, as stated at the outset in this opinion, thereafter deferred to his ruling.[8] The issue was submitted on affidavits, testimony, and oral argument, and decided by written findings and conclusions under date of February 4, 1983.

The first finding of fact provides Judge Workman's view of the legal effect of the order of May 10, 1982, and would flavor all future appellate determinations:

---

**8.** Judge Bruce later, on an appeal to district court from Judge Workman's order denying Carmen's motion for an order requiring George's compliance with the executory terms of the Partition Order, pointed out with some clarity that: "Carmen's right to be secured by a mortgage on the real property was *a significant portion* of the Order of Partition; and *the effect of the trial court's order* [denying her that relief] *was,* for all practical, purposes to *destroy that right* to a security interest." R., Case No. 15460, Vol. 1, p. 182. However, Judge Bruce was in error in two vital respects in his analysis. The only recoverable judgment awarded by the Partition Order was for the sum of $100,000, and on that amount Carmen would have a lien on any interest in real property which George might own or thereafter acquire, assuming recordation of the Partition Order. The Partition Order did not order George to give Carmen a mortgage on that $100,000. The mortgage required to be given was not to secure a money judgment, as Judge Bruce erroneously thought, *but to secure a note,* and the amount of that note would be the sum of $273,739.40. He was undoubtedly correct in seeing that the right to be secured was a *significant portion* of the Partition order. Evidencing his deference, on the next page, he provides his reading of Judge Workman's construction of the Partition Order, wherein he also acknowledges the requirement of a note and mortgage, but erroneously sees both as being security for a money judgment:

In its Findings of Fact and Conclusions of Law, the trial court construed the Order of

## FINDING NO. I

On the 10th day of May, 1982, this court entered an Order of Partition which provided, among other things, that the real property previously owned by the community of plaintiff and defendant *was conveyed to and vested in defendant George A. Suchan as his sole and separate property, subject to a lien in favor of plaintiff Carmen Estelle Suchan in the sum of $373,739.40.*[9] Case No. 15460, R., pp. 61–62 (emphasis added).

Judge Workman's first conclusion of law was of the same vein:

The Order of Partition of this court dated May 10, 1982 *granted to plaintiff a money judgment for all of her right, title and interest to community real property previously owned by the parties and conveyed and vested in defendant all of said real property, subject to*

Partition as being operative at the time it was signed; the real property was awarded to George and Carmen received a money judgment in the amount of $373,739.40 to be secured by a promissory note and a mortgage against the real property. (Conclusion of Law #1, p. 4) The partition was not conditional or dependent upon any acts of George. R., Case No. 15460, Vol. 1, p. 183.

He proceeded to declare the Partition Order ambiguous (something Judge Workman as the trial court had not done) and ruled that: "The construction given to the Order of Partition by the trial court is reasonable ...," going on to add his own view that Judge Workman's construction allowed George to receive (own) all of the realty as his sole and separate property, with "Carmen receiving a cash settlement...." *Id.* at 184. Judge Bruce's decision demonstrates no awareness as to how the Partition Order came into existence, other than that it was drafted by Carmen's attorney whom he blamed for the ambiguity—which ambiguity he never isolated for critical examination.

**9.** The real property had indeed at one time previously been community real property, but after the divorce decree was entered, each party owned his and her own undivided one-half interests, and each and both could have disposed of the same. But at the time of the partition proceedings it was owned in cotenancy, of which there can be no doubt, and as Mr. Ling has so agreed.

*said Judgment lien. Id.,* p. 64 emphasis added).[10]

Judge Workman's Finding No. I and Conclusion No. I are the main focal point of all inquiry, because a proper interpretation of the Partition Order governs or affects the applicability of all ensuing decisions, determinations and orders. Judge Workman did not provide either the intermediate appellate court, District Judge Ronald D. Bruce, or this Court with any memorandum decision which would explain how he so reasoned. All that we have are Judge Workman's above-quoted bare legal conclusions as to the effect of the document of which his sole involvement was the affixing of signature, but which we previously thought was a document which he had authored, or, at the least, embodied a decision which he had made and passed on to counsel for the parties for the drafting thereof. Later proceedings shortly thereafter shed some illumination on what apparently influenced Judge Workman to characterize the Partition Order.

Following the January 1983 hearing and decision, there was another hearing before him on a motion by Carmen to set aside the execution sale. Judge Workman, on March 9, 1983, filed his findings of fact and, on April 1, 1983, filed his opinion and conclusions. The findings disclose that somewhere along the line the judge had forgotten how the Partition Order, by now the cause of all controversy, had come into existence. By his second of seventy separately stated findings, he attributed the entry of that order to Carmen: "Subsequent to the trial of this matter, and on May 10, 1982, this court entered its Order of Partition pursuant to Plaintiff's Motion for Partition." Case No. 15460, R., p. 80. In another finding he quoted from a recital that *"the judgment sought to be enforced as a money judgment"*—apparently being willing to deduce therefrom that Judge Bruce had characterized the entire May 10, 1982 order as money judgment—with which he, Judge Workman, did not want to or did not quarrel:

> The District Court's Order of December 13, 1982 provided in part, as follows:
>
> "7. The Court having been informed, in open court, that the Defendant could not post a cash deposit or supersedeas bond, *and it appearing to the Court that the judgment sought to be enforced is a money judgment,* and after hearing the argument of counsel, the court being fully informed, and good cause appearing therefore,
>
> IT IS ORDERED that the execution sale should proceed, as published and noticed, on the 15th day of December, 1982...."

(Files herein; emphasis added). Case No. 15460, R., p. 80.[11]

In the very next finding, Judge Workman seemingly accepts as gospel the proposition that the real property advertised for sale and sold was all owned by George—notwithstanding that it was only George's right, title, and interest therein which Sheriff Jarvis had levied upon and advertised for sale.

> "8. On December 15, 1982 an Execution Sale was conducted, the physical location of the sale being upon a portion *of the real property awarded to the Defendant pursuant to the Judgment* in this matter." Case No. 15460, R., p. 80 (emphasis added).

Another finding which is questionable because it is less than complete, but which clearly shows the flavor of the court's decisions, is:

> 14. ... Prior to the Sheriff offering Parcel No. 1, Richard K. Smith announced to the prospective bidders that Parcel No. 1 was offered *"subject to the continuing lien of Carmen Estelle Su-*

---

10. The Partition Order is entirely devoid of any language purporting to impress *a lien* in favor of Carmen against the formerly at one time community property.

11. Without doubt the execution was aimed at collecting a money judgment, $100,000 to be exact.

*chan."* Case No. 15460, R., p. 81 (emphasis added).

A subsequent finding was equally questionable as viewed relative to the evidence:

21. Prior to the sale of each parcel, Mr. Smith announced to the prospective bidders that the parcels were being sold subject to the continuing lien of Plaintiff. Mr. Smith also announced that certain affected parcels were subject to Federal Land Bank, Small Business Administration, Strasser Drilling and A.S.C.S. mortgages. Case No. 15460, R., p. 82.

Finding Nos. 37, 38, 41, and 42 enumerated various encumbrances, and did bear out that Mr. Smith did caution the bidders about those various liens.

Another finding laid somewhat of an onus, or "guilt trip," on Carmen for the whole situation:

52. Prior to the Execution Sale, and subsequent to the Partition Order entered herein, *Plaintiff never gave to Defendant an alternate method by which to satisfy Plaintiff's interest in the parties' property.* Case No. 15460, R., p. 86 (emphasis added).[12]

The testimony of Sheriff Jarvis was somewhat like Judge Workman's findings, but not in close enough conformity therewith so as to allow the findings to pass muster. The sheriff was uncertain as to what was said about Mr. Smith's statements, especially as to claiming "a lien," but very specific that Mr. Smith advised the potential buyers present of Carmen's ownership of an undivided one-half interest in the property being sold, of which George owned the other undivided one-half interest which had been levied upon:

Q. Okay. What did he say prior to each parcel for sale?

A. I can't say word for word. And I don't even remember for sure who, other than the fact that he, prior to the sale of each parcel, that he would announce that there—the continuing lien of Carmen Estelle Suchan would apply to this property. Then, if there was some other liens, he would announce those.

Q. Okay. Now, did he announce that also as to the last parcel that was sold, that Mrs. Suchan's lien applied to that?

A. I believe he announced on all of it, plus there was Strasser's name was mentioned in there. There was somebody— When we're talking about the last one, we're talking about the one the sugar factory bought.

Q. The Sugar factory bought, yes.

A. There was some lien against some big grain bins that set way back off over in the corner. And I don't recall—I didn't write any of that down.

. . . .

Q. *From what you heard Mr. Smith announce, do you think that those who were there understood that there was some claim of some sort as to this property by Carmen Suchan?*

A. Oh, I'm sure. I'm sure. They couldn't have helped not to. *He made it very plain that she still had an interest in that property.* Tr. of Proceedings, March 3, 1983 (emphasis added).

The foregoing testimony was given by Mr. Jarvis when called as a witness by Mr. Larry Duff, representing Frank Suchan.

Mr. W. Parsons, an attorney who had been present at the sale, where he represented one of the bidders, Amalgamated Sugar Company, called as a witness by Mr. Duff, corroborated the sheriff:

Q. Where there any comments made by Mr. Smith that you heard at any time concerning any liens against the property?

A. Yes.

Q. And what was said, to the best of your recollection?

---

12. This finding is the closest Judge Workman ever came to recognizing that Carmen owned an undivided one-half interest in all real property per his own divorce decree. Nothing in the record reveals any reasoning which would require Carmen to provide George with an alternate method.

A. Mr. Smith, after Mr. Jarvis read the notice, and as he sold each parcel, Mr. Smith advised those people—or at least—apparently (inaudible) condition, that the property was being sold subject to the *interest* of Carmen Suchan. *Id.* at 13–14.

On cross-examination by Mr. Ling, Mr. Parsons did change the word "interests" to judgment lien—concerning which it was, or both, he wasn't much concerned:

Q. You indicated that you heard your partner indicate that the property was being sold, subject to the interests of Carmen Suchan. Is that my—

A. A judgment lien of Carmen Suchan.

Q. Oh. You said a judgment lien?

A. Yes.

Q. Okay. *And* did you know that— *Well, that was the judgment lien, of course, that was being enforced by the Writ of Execution of the sheriff, wasn't it?*

A. I don't know that.[13]

Q. You didn't know that. Well, you had investigated this for the Amalgamated Sugar Company?

A. I had.

Q. And what did it mean to you when your partner stated, "The property is being sold subject to the judgment lien of Carmen Suchan?"

A. What it meant to me, Mr. Ling, that it was recorded in Minidoka County, a court order making certain provisions. I can't recite all those provisions to you. *Id.* at 18–19 (emphasis added).

Carmen took the stand, and was allowed to explain what interest she believed that her execution was directed against—with Judge Workman in the process acknowledging that his only participation with regard to the Partition Order had been the signing of it:

Q. Mrs. Suchan, did you believe that you still had a—an actual interest in the land at the time of sale?

MR. LING: Your Honor, I'm going to object to the plaintiff's belief. It's immaterial and irrelevant.

And, also, I'm going to object to the leading question. It's been most liberal. But I think it's improper to constantly put words in the witness's mouth, as all the questions have.

THE COURT: I will sustain the objection on the basis that it's leading.

MR. SMITH: Very well, Your Honor.

Q. (By Mr. Smith) At the time of the execution sale, Mrs. Suchan, what did you think your interest in the land was?

A. Well—

MR. DUFF: Objection, Your Honor. It's speculation. She's—

MR. LING: Well, we also object.

MR. SMITH: She—It's hardly speculative of what she thought. Her interest was of record.

MR. DUFF: I think—I think it's a matter of what the witness thinks her legal position may be. Of course, it really isn't material to the case what the question is, what her legal position was.

MR. SMITH: That's interesting, Your Honor, since she was bidding at the sale. She normally would have an opinion that was formed as to what she was selling. It's very germane to this.

THE COURT: Well, gentlemen, *the court is fully aware of the legal issues relating to counsel—various counsel's interpretations of the court order.*

*The court is also very well aware of the court's opinion regarding that order, since the court is the one who ultimately signed it.*

I'm going to allow Mrs. Suchan to answer that question. *Obviously the doc-*

---

**13.** As a matter of law, if the Partition Order had been recorded, it did constitute a $100,000 (plus accrued interest) judgment lien on any real property interest owned by George. Such would not affect the obligation of the sheriff to levy upon the same property interest. The lien of a judgment properly recorded would establish the date of priority to be given to Carmen's judgment. In order to sell real property at execution, the sheriff is required to properly levy upon it, and advertise the sale.

uments contained within the file speak for themselves, and to the certain extent Mr. Smith, you are inquiring regarding a legal opinion, which Mrs. Suchan is not authorized to give at this point. However—

MR. SMITH: Oh—

THE COURT: However, I will allow her to answer the question.

MR. SMITH: Thank you, Your Honor.

THE COURT: Yes.

THE WITNESS: At the time of the sale, I believed that *we were executing on George's half-interest in the property, trying to get started on the agreement that had been made—the agreement earlier, trying to get the down payment* so that we could get on with the agreement. *Id.* at 39–41 (emphasis added).

Nevertheless and notwithstanding the testimony, based on those findings, Judge Workman in his opinion and conclusions wrote the following excerpts:

That aside, this Court does not view Defendant's present position to be unjustifiable. *The Partition Order granted to Plaintiff a collectable money judgment.* Defendant was awarded farm machinery and farmland. Obviously the intent of the Partition Order was to keep intact a family farm, for the economical and emotional benefit of the parties and their children. As far as the Court is concerned, that was a reasonable solution to a difficult situation. Then came the Execution Sale. Defendant lost his farm machinery at the sale, as well as his farmland. The record is clear that in Defendant's opinion, if he redeemed the land, Plaintiff would merely cause another sale of his property. The record reveals Defendant's attempts to refinance his farming operation, to forestall such a sale, which efforts were fruitless. *This Court can sympathize with the hopeless*

predicament Defendant envisions. *The Court can also understand Defendant's position that if he cannot own the land, his brother should.* Case No. 15460, R., p. 93 (emphasis added).

Judge Workman again thrust upon Carmen the entire responsibility for the situation which *his* construction of the Partition Order had occasioned:

Plaintiff's most convincing argument for vacation of the sale is that Plaintiff misinterpreted the Court's Order of Partition which gave rise to her money judgment and the ultimate sale. That argument is somewhat watered inasmuch as (1) *the Partition Order came about as a result of Plaintiff's Motion for Partition; (2) Plaintiff's counsel prepared the Partition Order for the Court's signature; (3) Plaintiff proceeded to Execution Sale in the face of Defendant's objection in Court; and (4) the Court's order* which denies Defendant's Motion to Stay, *prepared and submitted by Plaintiff's counsel, refers to Plaintiff's money judgment.*[14] *Id.* (emphasis added).

At the time of the Execution Sale, *Plaintiff had a substantial judgment* against Defendant. Although she opted not to bid at the sale, she now complains that others bid too low. So low, she argues, that the amounts bid should shock the conscience of this Court. Upon that record, Plaintiff now asks equity to undo that which she caused to be done in the first instance. Case No. 15460, R., p. 90 (emphasis added).

Putting aside for now Judge Workman's construction of the all-important Partition Order where his involvement was only to sign it, we can, so unburdened, proceed with the review which we would have made initially had we not deferred as we did.

Of singular importance, Carmen Suchan's divorce complaint, after listing all of

---

**14.** This is critically erroneous. Carmen's attorney did not draw the order denying the stay. As stated *supra*, p. 1294, the court, Judge Workman himself, directed Mr. Ling to prepare the stay

order. The language of the recitation is in much the same language of George's opening brief in *Suchan I.* *See* discussion *supra,* at 121 n. 4, 741 P.2d at 1308 n. 4.

the community real and personal property, alleged that it "should be appraised, evaluated, and divided between the parties hereto equally.... Any outstanding indebtedness of the community should be retired, from the community assets, prior to division of the community property between Plaintiff and Defendant." And such, too, was a prayer of the complaint. The answer of George Suchan requested that in the event of a divorce being granted that there be "an equitable division made of the community property under such terms and conditions as will preserve the defendant's ability to provide for himself and his children." [15, 16]

The trial court magistrate, Judge Workman, notwithstanding that both parties requested an equitable division (George), or an equal division (Carmen), in the March 22, 1982, decree of divorce as to approximately $800,000 worth of realty, left the parties almost exactly as he found them, in a *co-tenancy* situation, each now owning as his or her sole and separate property, an undivided one-half interest in what before the judge's signature had been community-owned real property. Although the prayer of both parties was for a property division which would completely free each from the other, the divorce decree simply removed the community-owned status of the property and left them still as tenants-in-common of the real property which both had asked to have divided—the most important issue in the controversy, disregarding child custody, a separate issue which was also contested.

Responsive to no corresponding prayer by either party, and with Judge Workman's decree giving no guiding directions, $800,000 of real property was ordered to be "placed for sale *and sold* at the earliest date, and in a manner calculated to derive the maximum available proceeds for distribution between the parties hereto." R. (Sup.Ct. No. 14890), p. 87.

BUT, Judge Workman's decree also contained the provision which would lead to the involved litigation now before us for resolution:

IT IS FURTHER ORDERED that if partition of the property appears more feasible and necessary to effect the efficient distribution of the community property between the parties, *the Court will undertake the partition of the real and personal property of Plaintiff and Defendant upon motion* [17] *of either of the parties hereto. Id.*

Under that state of affairs, it was foreseeable that both parties would pursue a more final resolution of their affairs than the divorce decree provided. While Carmen was the first to again ask for an *equal* property *division*, which she did immediately on April 27, 1982, after George's post-judgment motions for amendment of the findings and conclusions had been heard and denied, George's proposal was in the court's hands *two days* later, also seeking an *equal* division. Both proposals on their face were eminently fair, being based on prior evaluations set by the divorce decree. Approval of either proposition, George's or Carmen's, would have completely freed the

---

**15.** George Suchan also alleged his claim to some of the real estate as being his sole and separate property. It was this issue which was one of those ultimately decided in *Suchan I.*

**16.** George Suchan also sought, and fought for, custody of the parties' two minor sons.

**17.** As mentioned *supra,* this "upon motion" language had significance later in further proceedings where Judge Workman would write in denying a motion to set aside the execution sale:
Plaintiff's most convincing argument for vacation of the sale is that *Plaintiff misinterpreted* the Court's Order of Partition which gave

rise to her money judgment and the ultimate sale. That argument is somewhat watered inasmuch as (1) *the Partition Order came about as a result of Plaintiff's Motion for Partition;* Case No. 15460, R., p. 93 (emphasis added).
Judge Workman did not at any time offer the parties any explanation for his not having divided the real property in the first instance, as had been requested by both parties.
Carmen's counsel had not at any time misinterpreted the Partition Order, but in later proceedings had to proceed upon the basis that he was bound by Judge Workman's interpretation.

parties from each other. After Mr. Richard Smith had presented Carmen's proposal and Mr. Laurence Duffin had presented George's proposal, two days later Mr. Roger Ling appeared in the case for the first time as attorney for George [18] and proposed an *unequal* division of the property. It was here for the very first time that Judge Workman was so propositioned, and where the unequal division of real property in George's favor would necessitate an offsetting compensating monetary exchange to Carmen in order to balance the equation.

Under *George's* proposal submitted by Mr. Ling, Carmen would receive less real property than under either of the first two proposals, but would receive $185,537.76—which would be paid thusly:

> (e) Payment by defendant to plaintiff, payable in not less than one year, nor more than ten years in ten equal annual installments, with interest thereon at the rate of 12% per annum, *secured by a mortgage on Section 16* property to be awarded to defendant. Case No. 14890, R., p. 102 (emphasis added).

Mr. Ling, in submitting George's second proposal, accompanied it with a written statement of reasons why it was equitable and just. It was apparently an argument which was in and of itself convincing, and if not, then was further buttressed by Mr. Ling's argument at the hearing held on the partition proposals on April 30, 1982. Judge Workman took the matter under advisement, stating that "Mrs. Suchan will get her fair share *and Mr. Suchan will be allowed to continue farming,*" R., p. 111, which oral statement by the court is found incorporated into what might be called the preamble to the partition Order of May 10, 1982, set out *infra*, at 132, 741 P.2d at 1319. In the argument portion of Mr. Ling's written proposal on behalf of George, he advanced the proposition that it would enable George:

> to proceed with his livelihood, and thereby allow him to pay the child support

ordered by the court to be paid. By allowing defendant to be awarded the Section 16 land, he will be free to make arrangements with his brother in regard to the well located on this property that was drilled by his brother but is not now used.

3. The division of farm machinery is based upon the farming needs of defendant. The proposed division of farm machinery represents an equitable division of that machinery and will allow plaintiff to proceed to sell the portion of machinery awarded to her in such manner as she may desire. It should also be pointed out that the values of this machinery were the values established by plaintiff and she should therefore have no complaint in regard to the value of that property awarded to her. Of course, if defendant is not awarded a sufficient real property to justify his farming operations, he would have no reason to retain the farm machinery that defendant has requested be awarded to him.

4. Any attempt to segregate irrigated ground from dry land located in the same section or quarter-section would create a substantial reduction in the value of the dry land. In addition, the costs of development of the dry land without the contiguous irrigated land would substantially increase the cost of this development. George's second proposal, Case No. 14890, R., p. 104.

After the Partition Order came into existence on May 10, then, when on July 12th Carmen sought an order to show cause which would require George's compliance with the court's order of May 10, 1982, she supported it with an affidavit (never contradicted by affidavit or testimony, but in fact supported by the remarks of Judge Workman himself), a paragraph of which contains the explanation of the genesis of the Partition Order which Judge Workman would sign, although not at all his own work product:

---

**18.** On the 30th day of April, a formal Notice of Substitution of Counsel was filed; Mr. Duffin out, and Mr. Ling in, as George's attorney.

6. The motion on partition was heard on the 30th day of April. On the 3rd day of May, 1982, prior to entry of a Partition Order by the Court, *the Plaintiff agreed to an offer made by the Defendant which was conveyed to the Court as settled and agreed* and was incorporated into the Order of Partition, by agreement of the parties, and the Order entered on the 10th day of May, 1982. Case No. 14890, R., p. 129.

The foregoing should serve the purpose of putting in proper perspective the decision of Judge Workman when he would sometime thereafter render his opinion as to the legal effect of the Order of May 10, 1982, where his function was only to sign it on its being represented to him that it was an agreement which had been reached, thereby freeing him from arriving at his own solution to the partitioning issue.

Of that the parties contemplated and the Order provided that George Suchan had to comply with the provisions for creating a documented and well-secured indebtedness to Carmen Suchan in order to obtain title to her undivided one-half interest in the realty and personalty there can be no doubt. It is well illustrated in the opening remarks of the May 10, 1982 order where, after referring to the hearing of April 30, 1982, is this language:

[T]he Court announced at that time that it was the Court's impression that the Defendant desired to continue a farming operation, and that the Court was inclined to so partition the real estate to allow the Defendant to continue, *subject to the Defendant's undertaking and carrying out appropriate arrangements for acquisition of the Plaintiff's undivided one-half (½) interest* in the community property of the parties, which would provide her appropriate financial flexibility and security therefore. Case No. 14890, R., p. 111–12 (emphasis added).

Paragraph 4 of that May 10 order provides a summary of what the order would accomplish,[19] which paragraph, for clarity and easier comprehension, sentence by sentence, is as follows:

1. The Court determines that the net community interest of each party, to be divided through this partition, is the sum of $445,844.40.

2. The Court, at this juncture, has distributed in kind to the Plaintiff machinery and household goods totalling $72,105.00 (excluding the home representing the community lien).

3. The Defendant, on the other hand, has received, under the provisions of this partition, all of the farm real estate, one-half (½) of the machinery, all of the cattle and commodities, one-half (½) of the household goods, and one-half (½) of the community lien on Defendant's separate property.

---

**19.** By a note incorporated in the order itself, and which was set out on the following page, the Court made it clear that allowing George Suchan to acquire the real property by purchasing Carmen's share would allow George Suchan to continue farm operations as he had during the marriage, and free each party from any kind of common ownership:

NOTE—The payment to Plaintiff, by the Defendant, of the balance of her community interest, in cash, is effected in order to allow the Defendant to continue the operation of the farm established during the course of the marriage. It is predicated upon the purpose of the Court to place each of the parties in sole possession of their respective interests at the earliest date for the protection of both parties. R., p. 119, May 10 Order.

The court, and sometimes the parties themselves in turn, inadvertently referred to the "community interest" of the parties. On the signing of the divorce decree, the property rights of the parties became sole and separate, undivided one-half ownerships. The confusion is understandable. The trial court offered its services to undertake a partition proceeding, which ordinarily would be done under the provisions of Title 5, ch. 6, Idaho Code. However, where, as appears *infra*, Carmen Suchan and George Suchan through counsel reached their own agreement for an unequal partition of property then vested in each as cotenancy estates, I deem of no consequence that neither the court nor counsel for the parties showed any awareness of chapter 6 of Title 5. We do note that the agreement reached by the parties themselves displayed some regard for I.C. § 6–541 and its provisions for unequal partition and compensatory adjustment.

4. The Defendant takes the community interest distributed to him subject to the outstanding indebtedness against the community.

5. The balance of the Plaintiff's community interest after deducting the machinery and household goods is in the sum of *$373,739.40* which *shall be paid by the Defendant to the Plaintiff as follows:* R., p. 118, Partition Order of May 10, 1982.

Immediately following the foregoing paragraph is that paragraph of the Order which does constitute a monetary judgment, concerning which there can be no doubt (nor does there seem to be any): *"DEFENDANT IS ORDERED TO PAY TO THE PLAINTIFF* the sum of $100,000.00 cash within forty-five (45) days of the date of this order."

The Order then proceeded to outline the terms and manner by which the $273,739.40 balance of the purchase price to be paid for Carmen's community interest was to be documentarily evidenced and secured, and the terms of payment:

The balance of the Plaintiff's community interest in the sum of $273,739.40 shall be paid to the Plaintiff by the Defendant in twenty (20) annual installments, bearing interest at the rate of TWELVE PERCENT (12%) per annum, and amortized over said 20-year period. The first annual payment shall fall due one (1) year from the date that the down payment of $100,000.00 is paid, or as the parties may agree. *The balance shall be reduced to a promissory note* restricting any advance payment in the first three (3) years thereof, with full right to prepay thereafter, to be *secured by a real estate mortgage on all of the real property awarded to the Defendant,* in addition to security instruments on the irrigation equipment located on the irrigated ground, and such other security measures for protection of the Plaintiff's interest that appear appropriate.

*The note and mortgage shall be escrowed,* with an escrow holder selected by the Plaintiff, together with the security instruments *and a satisfaction of the mortgage to be held thereby until full payment of the note,* both principal and interest, *has been made.* (Emphasis added.)

The body of the order was equally clear and unmistakable:

(b) TO THE DEFENDANT:

(1) The Defendant is awarded as his sole and separate property the following real estate, *subject to* his payment of all outstanding encumbrances thereon, and *the payment and security provisions hereinafter required to be made by him for and on behalf of the Plaintiff.*

*Parcel No. 1* —

TOWNSHIP 8 SOUTH, RANGE 22 EAST OF THE BOISE MERIDIAN, MINIDOKA COUNTY, IDAHO

Section 16: W ½

[Balance of descriptions of other properties omitted.] R. (Sup.Ct. No. 14890), p. 117.

The final paragraph of that order reads:

7. *IT IS ORDERED that each of the parties shall execute and deliver the necessary instruments of title, to the real and personal property, each to the other, as necessary to fully carry out the partition and distribution as herein provided. Id.* at 120.

"Subject to," of course, is a phraseology of art, and in the context here used can only mean *contingent upon, conditioned on,* or *provided that. See Barton's Legal Thesaurus,* Deluxe Edition 1980, p. 982, "contingent" at p. 624; *Black's Law Dictionary,* 5th Edition 1979, for the same words, pp. 1278 and 290, respectively. The Order in question, as drawn by counsel, agreed to, and thereafter signed by Judge Workman would immediately continue in the possession of George Suchan practically all that which originally had been the entire community property, and then cotenancy estate, and George in return had an immediate money judgment against him

for $100,000, with 45 days in which to pay it. The parties were both under direct order of the court to execute all necessary documents and instruments to effectuate the agreement whereby Carmen would deed to George her cotenancy ownership in the realty, and George would simultaneously purchase from her by means of a note and mortgage upon all ownership in the realty.

By way of analysis, while Carmen and George remained married, neither individually had a separate marketable interest in any of their community property. All that either of them had was an interest which has been described as a *moiety*. *Kohny v. Dunbar*, 21 Idaho 258, 121 P. 544 (1912). The moiety of each becomes a separate estate of either only on a divorce or upon the death of one spouse.

Upon the entry of the decree of divorce, the Suchan property ownership was changed from community into two separate undivided one-half interests.[20] Each was free to sell that undivided one-half interest for which, however, there is ordinarily no market. Moreover, and standing in the way, the terms of the divorce decree strangely ordered that the property now owned in co-tenancy would be forthrightly sold. If sold for cash, both Carmen and George would expect to suffer losses. If sold on a contract, George would be deprived of what had been his lifetime work, and, worse yet, if the buyer defaulted, the divorced couple would once again be thrown together as co-tenancy owners of a large farm.

That being the existing state of affairs, it is readily understood why George and his attorney would make the proposition to Carmen and her attorney, and why they accepted—everyone having been well-advised by Judge Workman of his predisposition to set over to George the farm real estate as he had so announced at the hearing where there had been placed before him—not just Carmen's partition proposition for an even division, but also George's first proposition for an even division, *and also a second George proposition where he would be buying out Carmen's undivided one-half interest in most of the real property.* The second proposition advanced by George through Mr. Ling, with modifications, would serve as the basis of the pattern for the buyout later submitted to the court for signature. George's proposition was that the net property value was $891,688.80, and the interests of Carmen and George were each $445,844.40. Under it, Carmen would have received George's interest in a certain quarter-section, thereby solely owning a property worth $184,-000. George would then pay her another $185,537.76. This would be paid, as stated in the proposal:

> Payment by defendant to plaintiff, payable in not less than one year, nor more than ten years in ten equal annual installments, with interest thereon at the rate of 12% per annum, secured by a mortgage on Section 16 property to be awarded to defendant. R., Case No. 14890 (augmented to No. 15460), p. 102.

Judge Workman, after having signed the Partition Order, would later, as observed *supra,* appear in part to infer that Carmen was at fault for having responded to his invitation to act as partitioner—notwithstanding that both parties did so, and notwithstanding that it was his own definite intimation to the parties that he was inclined to keep the farm intact for George, as argued for by George, which brought about the preparation of the Partition order and its submission to him for signature.

In sum, the Partition Order is absolutely clear and unequivocal. Contrary to what

---

20. At oral argument on rehearing, counsel for George Suchan was in agreement that after entry of the divorce decree, Carmen and George were cotenants:

> ... It's true that the original divorce decree did make the parties tenants in common, and I don't think there's any question about that

as of that—and the difficulty was that we didn't agree that she had the right to be tenant in common on all that property and so we were on appeal trying to get that straightened out. Oral argument on rehearing, Sept. 2, 1986.

Judge Workman read into it later, it contained no language capable of being construed as awarding Carmen a money judgment for any amount over and above $100,-000. There is no language in the Order capable of being construed as judicially impressing a lien in Carmen's favor. The word "lien" is not to be found.[21]

The trial court obviously was not in a position to award George the undivided one-half interest in the real property which he owned in cotenancy upon the recording of the divorce decree. Clearly, then, where the Partition Order states that the described real property was "awarded as his sole and separate property" was Carmen's undivided one-half interest that flowed to her by the decree of divorce. That is clear. What is equally clear is that the quoted language was not freestanding, but specifically conditioned by the language prescribing George's obligation to furnish Carmen with a $273,739.40 note, "to be secured by a real estate mortgage on all of the real property awarded to the Defendant."

The transaction was purely and simply for the sale by Carmen and the acquisition by George of Carmen's cotenancy real ownership. It could have as easily been of a transaction of the parties without involving the court at all, and the parties could have so advised the court, and dismissed the partition proceeding. George would have signed two notes, one a 45-day note unsecured, and the other larger note for the balance secured by the same mortgage called for in the Partition Order—all properly escrowed, with Carmen's mortgage from George and Carmen's deed to George being recorded simultaneously. Why it

was not done in this manner—the most ordinary of real estate transactions—was not understood until oral argument at rehearing, where Mr. Ling explained:

MR. LING: ... I'll remind the Court that I got into this case after the judgment and decree of divorce had been entered. The purpose of my becoming involved was to appeal that decision because it was questioned whether or not all the property that had been designated as community was in fact community. This Court, as you know, ultimately determined that there was a transmutation by a community property agreement for conveyance of property upon death. The Court determined that that was sufficient to transmute the property to community property.

During the time that that matter was on appeal, the motion for an order of partition was filed by Mrs. Suchan. There was not a stipulation, in all deference to what Mr. Smith has said, as to the terms of the order of partition. There were several agreements or proposals submitted to the court. The court, at the hearing on those proposals, made a determination at the conclusion of the hearing that it did not have—it was not of a disposition to break up the property, was going to and felt that George should continue to have the property to farm and suggested that there be some way for a provision whereby George would, in fact, purchase Carmen's interest.

JUSTICE BISTLINE: Mr. Ling, is there a reporter's transcript to what you've just recited?

**21.** In discussing one of Carmen's claims made after Judge Workman gave the parties his construction of the Partition Order which divested Carmen of her ownership, Carmen urged that she had an equitable mortgage. Judge Bruce wrote:

[T]he Order does not evidence an intent by the parties to create a mortgage by the Order itself. It directs that a mortgage be executed at some point in the future, after the payment of the $100,000.

The general rule is stated in 55 Am Jur 2d, Mortgages, § 12:

"Although an equitable mortgage may be predicated upon an agreement to give a mortgage, the general rule is that an instrument cannot operate as an equitable mortgage if it merely assumes that a lien has been or will be created; it must purport through its own terms and efficiency to create the lien."

Because the Order of Partition does not purport, by its terms, to create a mortgage, but directs that independent instruments be executed, it cannot create an equitable mortgage.

MR. LING: Yes, of the judge—I'm sure the judge's remarks—

JUSTICE BISTLINE: I found them in the court minutes, but I didn't find them anywhere in a reporter's transcript.

MR. LING: Well, your Honor, I'm not positive about that because I haven't looked it up, but it was made at the conclusion of the case, and he gave his inclination was not to—and I think that's stated in both briefs—that he did not really want to divest George of the property which he'd been farming. He wanted to give him an opportunity to continue farming and suggested that there be a method to resolve it by his purchasing it. And, as a result, there were some communications and discussion. But, I would advise the Court, I was in a position that we were on appeal and we didn't believe that there was any $373,000 or $400,000 some odd dollars due. We took the position—hey, that's not community property and, Carmen, you don't have an interest. There's no way that I was going to come into court and stipulate that she could have a judgment for x number of dollars. Something was going to take place, though, and we were on appeal. The Order of Partition did come in. We did not object to the terms of the Order of Partition, and, frankly, I believe it's in the record later on, that George attempted to complete and abide by that Order of Partition when we could not get it stayed.

JUSTICE BISTLINE: Before you go ahead with that, I'd like a little bit more clarity on your participation. This document was drawn by Mr. Smith—no argument about that—it was laid on the judge's desk. You saw it. Mr. Smith's brief says that this document was drawn after you had the hearing in front of the judge, that the offer, suggestion, or whatever you want to call it, approach was made by you, and that this was worked out by the lawyers and then taken to the judge and, I assume—did you go to the judge when it was taken?

MR. LING: No, I did not.

JUSTICE BISTLINE: But you knew it was going?

MR. LING: I had not seen it until it was sent to me and taken to the judge simultaneously, but we did not object. I'll admit we did not object. We're not in a position to object because we were on appeal. How was I to come back in and say, your Honor, we want to change it, because we were saying that, hey, you don't have that much coming and you can't come into court and offer something different, or offer a way to resolve something when you don't believe we're on the right premise to begin with. And I guess that's the difficulty in these things taking place and continuing while you're on appeal on the original issue. Oral argument on rehearing, Sept. 2, 1986.

That explanation, while it seems plausible enough, nevertheless leaves the question why the parties could not have documented in the transaction that it would be subject to rescission or modification depending upon the outcome of George's appeal to this Court challenging the trial court's holding that George's separate property had been transmuted into community property of both George and Carmen.

When the same subject had arisen in the trial court, the argument by George's counsel had largely been of the same vein as to what was said, but did not mention the appeal as being a reason for not conceding that it was an agreed or stipulated order which would be presented for the Court's signature. With George Suchan on the stand under examination by Carmen's attorney:

Q. Now, remember how we agreed that you would be able to acquire Carmen Suchan's interest?

A. I don't believe I was (inaudible) on the agreement.

Q. Well, didn't you in conjunction with your attorney stipulate with us as to how you would acquire—

MR. LING: Your Honor, I am going to object to the word "stipulated." There

was a proposal which was submitted and proceeded to be given to the Court, and was not in the form of a stipulation. There's no question between counsel— we had made a suggestion as to a possibility of getting a settlement. That was in it. *We advised the Court that we had agreed to that.* But it was never in the form of a stipulation.

....

... [B]ut there was no written stipulation, or no stipulation in open court. It was a situation that we—the Court had indicated what you felt would be done with that, and then we discussed it, and then advised the Court what we felt would be a reasonable method of partitioning the property.

THE COURT: Mr. Smith, what's your position on that?

MR. SMITH: Your Honor, all I am trying to establish is, the partition was an agreed order of partition. Counsel denies that—

MR. LING: Absolutely.

MR. SMITH: —there was an agreed order of partition.

MR. LING: I denied it, Mr. Smith.

MR. SMITH: Well—

THE COURT: All right. Let me—

MR. SMITH: He's not testifying, your Honor.

THE COURT: yes.

MR. SMITH: I am talking about what Mr. Suchan understood.

THE COURT: All right. The way the Court understood the partition order—if this will settle the semantical argument over the word "stipulation,"—was, we had an order to show cause. The Court suggested to counsel that the Court desired that Mr. Suchan be allowed to continue in his farming operation, understanding that the plaintiff would have a monetary interest in that farming operation, representing her one-half equity in the community property. And the Court then suggested to counsel that the matter be proposed to the Court in that

regard. I then received a partition order. I reviewed that. I did not see any objections from counsel, I did not receive any, and then signed that.

So, I know, probably, the word "stipulate," as that is a term of art in the law, was—is not the right term; that it was a proposal submitted to the Court by the attorneys. And, frankly, I don't know if it is stipulated or not. All I have is just what came as a result of—

MR. SMITH: Let me ask counsel directly. Wasn't it agreed, whether a representative of the Court was (inaudible)?

MR. LING: Yes.

MR. SMITH: Wasn't it—as long as you are testifying—

MR. LING: I am not testifying, Mr. Smith, you understand that?

MR. SMITH: I do realize that.

MR. LING: Okay.

MR. SMITH: Wasn't it your offer of a way to acquire the interest to pay $100,-000 and secure the rest of all the property, wasn't that your offer?

MR. LING: That was proposal, yes.

MR. SMITH: And you accepted it—

MR. LING: That's right.

MR. SMITH: —as a method of buying out Carmen Suchan?

MR. LING: As a method, no. As a method to present to the Court as a partition order, consistent with what the Court had indicated it wanted to do; that's right. Partial Transcript of Proceedings, January 17, 1983, pp. 6–10 (emphasis added).

What the parties must face up to is that the Partition Order was never appealed from and never challenged. It has been for over four and one-half years wholly final. Enough has been stated by the trial court and by counsel to establish that its terms were agreed to, and it was understood that it would be presented to the court for signature by Carmen's attorney, with the knowledge of George's attorney, and his concession that he did not object to it, nor does he object to it. Undoubtedly,

there was a time frame during which either of the parties might have moved to be relieved of it. Undoubtedly, had the appeal in *Suchan I* gone differently, George would have done so. Had either party sought a stay of further proceedings below, while this Court deliberated upon and decided *Suchan I*, there is no reason to believe that a stay would not have been granted, provided that Carmen was protected against any loss resulting from George's continuing occupancy and use of the farming property and Carmen's equipment.

## CONCLUSION

In sum, it is clear from the foregoing that the Partition Order was executory in nature, contemplating the transfer of Carmen's interest in the real estate to George only upon his providing her with security by way of note and mortgage. Thus, at the time of the execution sale, those events having not yet occurred, Carmen's one-half interest had not yet passed to George, and the writ of execution and notice of levy only operated as to the "right title and interest of the defendant in to the above-described real estate," *i.e.*, George's one-half interest.

Following the rehearing, our only course of action was to make a more thorough review of the record and compare it to our first opinion. Having done so, I find it inconceivable that a majority of the Court prefers to adhere to the views and conclusions earlier expressed, but nevertheless extend credit to the Court for allowing Judge Workman to reconsider in the light of what is just and equitable.

For my part, as appears *infra*, I would reverse, based on the inescapable conclusion that Carmen is still half owner, and is entitled to an accounting for the five years' use of her property which the present owners of George's one-half have had, meaning his mother and brother. The trial court, in the exercise of its equitable powers, would be remiss in its quest for justice which erases this dark day if it did not ascertain George's involvement in those farming operations, the benefits which have accrued to him, and the taxes paid on those benefits.

## APPENDIX

Table of cases where the Court made a disparate award of assets compensating the recipient smaller award with a monetary award against the other—none of which cases had to do with participation of property owned in cotenancy.

1. *Lawson v. Lawson,* 87 Idaho 444, 394 P.2d 1008 (1964);

2. *Jackson v. Jackson,* 87 Idaho 330, 393 P.2d 18 (1964);

3. *Pipatti v. Ripatti,* 94 Idaho 581, 494 P.2d 1025 (1972);

4. *Hooker v. Hooker,* 95 Idaho 521, 511 P.2d 800 (1973); and,

5. *McBride v. McBride,* 112 Idaho 959, 739 P.2d 258 (1987).

In *Lawson* where the husband received the lion's share of community property the compensating monetary award to the wife was by a judgment:

> "The plaintiff, Richard Lawson, is directed to pay to her [the wife] the sum of $25,000, payable $5,000 within thirty days after date of this decree, and $2,500, per year for eight years without interest."

On appeal, the Supreme Court judgment was: "The judgment is modified in the respect that interest at the rate of six percent per annum is allowed on the deferred payments ... from the date of the judgment, March 7, 1963.

Clearly, there was a monetary judgment for $25,000, and there was not requirement of giving a note secured by a mortgage. In *Suchan*, however, there was a monetary judgment for $100,000. Assuming a definition of "money judgment" is necessary, *Black's Law Dictionary*, 5th Ed., p. 757 provides one: "Money Judgment. One which adjudges the payment of a sum of money, as distinguished from one directing

an act to be done or property to be restored or transferred. A judgment, or any part thereof, for a sum of money or directing the payment of a sum of money."

In *Jackson v. Jackson*, the district court awarded the defendant's wife "property of a value less than one-third the net fair market value of all of the community assets." On the appeal the Supreme Court held so that the wife receive at least one-half, and remanded with directions accordingly, but provide for a compensating monetary award:

> The trial court made findings of fact to the effect that the interests of both parties would not be served by a lump sum award. This course considers that respondent has no means or method of making a cash adjustment. Were he required to sell the Union Paper and Supply Company, it would virtually destroy a community asset; that is, respondent would be forced to sell the company for much less than its present value. While ordinarily the court should so dispose of the community as to give each spouse sole and immediate control of his or her determined share, *Largilliere v. Largilliere*, 50 Idaho 496, 298 P. 362 (1931), such a settlement would work a hardship in this case. The trial court's decree, therefore, may provide that respondent pay appellant her community share in monthly installments or otherwise, to be secured by whatever means the trial court deems proper. 87 Idaho 335, 393 P.2d at 23.

In *Jackson*, as shows in the record on appeal which is available in the State Law Library and in the Office of the Clerk of the Supreme Court, the district court also impressed a lien on future payments which the husband owed to the wife, and the court, the Hon. Paul W. Hyatt, who had earlier served as a justice of the Supreme Court, understood that the impressing of a specific lien, as against the general lien against real property of a properly recorded monetary judgment, required specific language:

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that none of said payments, except those upon the policies insuring the life of the defendant shall terminate upon his death *but shall continue to be a lien* upon said capital stock and a claim against his estate, all as set forth in Paragraph XVIII of the Findings of Fact and with provision for the defendant to have all the voting rights of said corporate stock so long as he is . . . ."

In *Ripatti v. Ripatti*, the Supreme Court upheld a disparate property disposition:

> In his last assignment of error, appellant argues that he should not be required to purchase, at $225 per month, his wife's half-interest in the ranch and cattle. Appellant's fixed income is $400 per month, a total disability pension from the Veteran's Administration for crippling arthritis. In addition, appellant customarily earns approximately $3,000 per year for sale of cattle each autumn. His other expenses include support of two children and payment of a mortgage at the rate of $100 per month. In aggregate terms, his usual yearly income is $7,800, while the mortgage and court decree absorb $3,900, leaving a like amount for support of himself and the children.
>
> I.C. § 32–712 provides the trial court wide discretion in disposing of the community property and homestead upon dissolution of a marriage. Ordinarily, the court should award the spouses sole and immediate control of their determined shares; but the court may award all community property to one spouse subject to an obligation to pay the opposing spouse half its value in monthly installments where, as here, the best interests of the parties and the children require that the family home remain intact. The trial court's excuse of discretion in ordering payments of $225 per month has not been shown to violate a statute or cause a "serious inequity," and will not be disturbed on appeal.

The district judge, The Honorable Dar Cogswell, also understood the necessity of

specific language for entry of a *money judgment,* and the creation of a specific *lien:*

> IT IS FURTHER ORDERED, ADJUDGED and DECREED that Joy Shirly Ripatti shall have a money judgment against Herman Wilford Ripatti in the sum of $20,305.00 plus interest thereon from the date of this Decree here below written at the rate of 6% per annum. This judgment shall be a lien against the following described property, to-wit:
>
> [Property Description.]

In *Hooker v. Hooker,* there was a disparate award. An 80–acre tract was awarded to the husband, who separately owned adjoining land:

> The district court heard testimony of two purportedly disinterested appraisal witnesses as to the value of the 80 acre tract. One witness, Mr. Gridley, ascribed a value of $100 per acre to the property, while the other, Mr. Lee, estimated the value to be $200 per acre, a price at which Mr. Lee said he would purchase the property. In addition, both parties estimated the value of the property. Respondent, after initially claiming the property was worth $200 per acre, retracted his initial estimate and attached a value of $100 per acre to the property. Appellant testified that she should purchase the property at $175 per acre. The trial court in its disposition of the property awarded the entire tract to respondent, valued the property at $150 per acre, and gave appellant a lien on the property for $6,000, one half the value of the property.[1]

In *McBride v. McBride,* the Court approved a Property Settlement Agreement whereunder the parties—without any previous intimation by the trial court as to what it intended to do—worked out their own solution in language that was as common, run-of-the-mill as that which was used by Carmen's attorney in drafting the Protection Order which counsel had agreed upon *after* having been told by the Court that it intended to give the bulk of the farm properties to George, who would have to compensate Carmen.

The McBride agreement provided for all real property to become the husband's, certain items of personal property each way, and to make the wife whole:

> The sum of $48,154.00 to make an even division of the community assets payable as follows:
>
> The sum of $15,000.00 cash within one year of the date of this Agreement, said sum to bear no interest and no prepayment penalty. The balance of $33,154.00 will be paid at the rate of $406.78 per month including interest at ten percent (10%) per annum. Interest is to commence on the date of the separation with the first payment due on the date of separation. The next payment is due on the 10th of the following month. Husband will have the right to prepay at any time; provided, however, there will be a prepayment penalty for any prepayment as follows:
>
> During the 1st year the sum of $6,846.00,
>
> During the 2nd year the sum of $5,621.00,
>
> During the 3rd year the sum of $4,360.63,
>
> During the 4th year the sum of $3,067.85,
>
> During the 5th year the sum of $1,746.54, and
>
> During the 6th year the sum of $401.40,
>
> being the years commencing from the date of the separation, and thereafter there will be no prepayment penalty.

As here in *Suchan,* in readily understandable language, the husband was to have the real property, subject to indebtedness against it, and the entire ownership of the real property would be mortgaged to secure the debt he would owe Mrs. McBride.

---

1. Mrs. Hooker has never understood how the Supreme Court could uphold her being made an unwilling seller at $150.00 per acre, when a reputable broker witness was ready, willing and able to purchase the 80 acres at $200.00 per acre.

The husband shall give to the wife a mortgage on the above described real property for the purpose of securing the above indebtedness. This mortgage will be junior to the existing Deed of Trust at the First Bank of Troy, Troy, Idaho, and an anticipated Second Deed of Trust in the approximate amount of $6,000.00 at the First Bank of Troy, Troy, Idaho. The mortgage and note on the above described real property shall be held for collection at the First Bank of Troy, Troy, Idaho, and collection fees, if any, will be divided equally between the parties; provided, further, that after husband has paid the $15,000.00 cash within one (1) year of the date of this Agreement as aforesaid, the wife agrees to release the above described property excepting therefrom the following described parcel:

A PARCEL OF LAND LOCATED IN THE SE ¼ NW ¼ AND THE SW ¼ NE ¼ OF SECTION 9, TOWNSHIP 39 NORTH, RANGE 3, W.B.M., MORE PARTICULARLY DESCRIBED AS FOLLOWS:

[Description omitted.]

There was, as in *Suchan*, as provision for execution and delivery of the necessary instruments, and a provision for the remedy of specific performance:

10. EXECUTION OF INSTRUMENTS: The parties covenant and agree to execute, acknowledge and deliver such instruments as shall be proper and necessary to carry out and effectuate the undertakings of the parties as expressed in this Agreement.

11. SPECIFIC PERFORMANCE: In the event of any breach of this Agreement or any term or condition thereof, by either party to this Agreement, the other party shall have the right, at his or her option, to institute and maintain a suit in a court of competent jurisdiction for specific performance of this Agreement, and each and every term and condition thereof, by the party in default...."

At the conclusion of the agreement there was the provision for incorporation and merging of its terms in the event of a divorce.

Other than that the Suchans agreed Partition Order itself was a monetary judgment for the $100,000, agreed upon down payment, due in 45 days, and the $15,000 down payment in *McBride* was by note payment due in one year, there is not one whit of discernible difference. In neither instrument is there any ambiguity whatever.